**Justin Terrance MONROE, Plaintiff–Appellant,**

v.

**CITY OF PHOENIX, ARIZONA; Donald Sherrard, husband; Jane Doe Sherrard, wife, Defendants–Appellees.**

No. 99–16974.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 13, 2001

Filed April 17, 2001

Tony K. Behrens, Law Offices of Tony K. Behrens, Glendale, Arizona, for plaintiff-appellant Justin Terrance Monroe.

Daniel P. Struck (argued) and David C. Lewis, Jones, Skelton & Hochuli, Phoenix, Arizona, for defendants-appellees City of Phoenix and Donald Sherrard.

Before: HAWKINS, McKEOWN, and WARDLAW, Circuit Judges.

McKEOWN, Circuit Judge:

The primary issue in this police-shooting case is whether the district court erred by giving the jury an excessive force instruction rather than a deadly force instruction pursuant to *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). Justin Monroe brought suit against Sgt. Donald Sherrard, an officer with the Phoenix Police Department, and the City of Phoenix (collectively, the "City"), alleging federal civil rights violations and state tort claims arising from an altercation in which Sgt. Sherrard shot Monroe. A jury returned a verdict in favor of the City on all claims. Monroe now appeals the district court's denial of his motions for judgment as a matter of law under Federal Rule of Civil Procedure 50. We conclude that while the district court should have instructed the jury regarding the deadly force standard, the error was harmless. Therefore, we affirm the district court's denial of Monroe's motions and also affirm the district court's rulings on the various other trial challenges presented in this appeal.

## BACKGROUND [1]

Late on September 22, 1995, in an industrial area of Phoenix, Monroe burglarized a check-cashing business, stealing more than $600 in rolled coins. At the time of the burglary, Monroe was armed with a long hunting knife, carried in a sheath; also, he had two pocket knives with three-inch blades, a screwdriver, and a pair of pliers in his pockets.

During the burglary, Monroe's companion, Tina Lopez, was waiting for him outside the check-cashing business with a ten-speed bicycle. Following the burglary, they rode away from the scene on the bicycle. Lopez carried the coins inside a pair of sweat pants that had been tied as a bag. At some point, Lopez dropped the heavy coins, spilling them onto the street, so they got off the bicycle and began gathering the coins.

Meanwhile, Sgt. Sherrard, driving nearby in his patrol car, had just heard a burglar alarm going off. He came across Monroe and Lopez, who were down on the ground near the bicycle, which was lying on the ground. Sgt. Sherrard, believing that Monroe and Lopez might have been in an accident, drove next to them and started to get out of his car to ask if they were okay. Monroe then picked up the bicycle and began to ride away, leaving Lopez behind. When Sgt. Sherrard asked if everyone was okay, Monroe turned the bicycle around and came back toward him. Although Monroe said that his bicycle had a flat tire, Sgt. Sherrard felt the tire, concluding that it was not flat.

While talking with Monroe about the bicycle, Sgt. Sherrard noticed the hunting knife, which was sticking out of Monroe's pants. When asked, Monroe took it out and showed it to Sgt. Sherrard. Although Monroe tried to return the knife to his

---

**1.** These facts are taken from the trial testimony of both Monroe and Sgt. Sherrard. Under Rule 50, however, we view the facts in the light most favorable to the City. *See LaLonde v. County of Riverside*, 204 F.3d 947, 959 (9th Cir.2000).

pants, Sgt. Sherrard took it from him and put it on the trunk of the patrol car.

What happened next is hotly contested by the parties, who testified at trial to drastically divergent versions of the events. In short, Monroe claims that Sgt. Sherrard shot him while he was surrendering, and Sgt. Sherrard claims that he shot Monroe during a physical altercation because he believed that Monroe was going to seriously injure or kill him.

According to Monroe, he showed Sgt. Sherrard both the hunting knife and the two pocket knives that he had in his pocket, and Sgt. Sherrard allowed him to put the pocket knives back into his pocket. Sgt. Sherrard testified, however, that he noticed that Monroe's left pocket was large and lumpy. Concerned about other weapons, Sgt. Sherrard asked Monroe what he had in his pockets. Monroe told him that he had tools. Feeling the left pocket to see if he could identify its contents as a weapon, Sgt. Sherrard felt what he thought might be a small .25 automatic pistol.

Monroe began to become agitated. When he tried to put his feet on the bicycle pedals and started to move away, Sgt. Sherrard grabbed his wrist and asked him if he had any identification. Monroe pulled away and cursed Sgt. Sherrard. As Monroe did so, he swung his right arm at Sgt. Sherrard, striking him in the head with a heavy object, which Sgt. Sherrard later concluded must have been the bag of coins.

After being hit, Sgt. Sherrard stumbled backward, drew his weapon, pointed it at Monroe, and ordered him to lie down on the ground. At the same time, Monroe dropped the bicycle and began to run away. Sgt. Sherrard gave chase, giving Monroe several orders to stop and threatening to shoot. When Sgt. Sherrard caught up with Monroe, he grabbed Monroe's shirt.

Sgt. Sherrard ordered Monroe to stop and go to the ground. Monroe did not comply; rather, he began pulling Sgt. Sherrard back toward the patrol car. Sgt. Sherrard put his gun back into the holster to get a better hold on Monroe's shirt. As Monroe dragged Sgt. Sherrard back toward the patrol car, Monroe was able to twist out of his shirt. He then turned to run. Sgt. Sherrard continued to order Monroe to stop and lie down on the ground.

When Sgt. Sherrard again got ahold of Monroe, Monroe spun around and a wrestling match ensued on the hood of the patrol car. Monroe wrapped his arms around Sgt. Sherrard and pushed him against the car, repeatedly lifting Sgt. Sherrard off the ground and pushing him against the car. Because of the position of the car relative to the curb, Sgt. Sherrard could not regain his footing. Sgt. Sherrard repeatedly told Monroe to stop resisting arrest and comply by going to the ground; Monroe yelled profanities at him.

At some point during the struggle, Sgt. Sherrard felt a tug on his gunbelt and thought that Monroe might be trying to pull his gun out of the holster. Sgt. Sherrard could not see Monroe's hands, although he thought that Monroe might have a gun in his pocket. Sgt. Sherrard then drew his gun from the holster to prevent Monroe from grabbing it. He tried to push Monroe away, stand up, and get his balance, while Monroe continued to push him against the hood of the car. Sgt. Sherrard told Monroe to stop or he would shoot him. After a continued struggle, Sgt. Sherrard shot Monroe at close range in the abdomen, causing significant injuries.

Monroe's version varies markedly. He claims that he began to run away from

Sgt. Sherrard, running fifteen to twenty feet before surrendering, with both arms raised. He complied with Sgt. Sherrard's request to come toward him, thinking that Sgt. Sherrard was going to handcuff him when, instead, he shot him. Monroe denied that he hit Sgt. Sherrard or that he had any physical altercation with him.

Monroe pled guilty to the burglary and was sent to prison. He then brought suit against the City under 42 U.S.C. § 1983, claiming violation of his civil rights, and also asserted state tort claims for false arrest and imprisonment, assault, and battery. The parties stipulated to dismissal of the § 1983 claim against the City of Phoenix and waiver of qualified immunity by Sgt. Sherrard, with the assurance that any judgment entered against him would be collectible from the City of Phoenix.

The case proceeded to a three-day jury trial. At the close of the evidence, Monroe orally moved for judgment as a matter of law under Rule 50. The district court judge denied the motion and submitted the case to the jury, which returned a verdict in favor of the City on all claims. Posttrial, Monroe filed a renewed Rule 50 motion and motion for a new trial under Rule 59. The district court denied both motions, and Monroe filed a timely appeal.

### ANALYSIS

### I. JURY SELECTION

 Monroe argues that the jury selection process was impaired because the district court did not inquire about the jurors' feelings and opinions regarding police misconduct litigation, and specifically, litigation concerning the now well-known Rodney King case and a high-profile case involving the Phoenix Police Department and an individual named Edward Mallet. According to Monroe, the judge's error in instructing the jury (i.e., failing to give a specific instruction regarding police officer

testimony, which we address below) compounded this problem. In this instance, we review the district court's conduct during voir dire for abuse of discretion. *Scott v. Lawrence,* 36 F.3d 871, 874 (9th Cir. 1994).

 We conclude that the district court did not abuse its discretion by declining to use Monroe's proposed voir dire questions. In reviewing a challenge to voir dire, we are mindful that "voir dire ought to be adequate to assure an impartial jury, by enabling the parties intelligently to exercise their challenges." *Paine v. City of Lompoc,* 160 F.3d 562, 564 (9th Cir.1998); *accord Darbin v. Nourse,* 664 F.2d 1109, 1113 (9th Cir.1981) ("[A] voir dire examination must be conducted in a manner that allows the parties to effectively and intelligently exercise their right to peremptory challenges and challenges for cause.") (footnote omitted). As we explained in *Darbin:*

> If an inquiry requested by counsel is directed toward an important aspect of the litigation about which members of the public may be expected to have strong feelings or prejudices, the court should adequately inquire into the subject on voir dire. The court must not be niggardly or grudging in accepting counsels' requests that such inquiries be made.

*Darbin,* 664 F.2d at 1113. The scope of voir dire depends on the circumstances of the case, which is why we give district judges broad discretion to control voir dire.

Here, the district court made clear that the case involved a law enforcement officer charged with excessive force. Although the judge declined to specifically question the jurors about the Rodney King and Edward Mallet litigation, he sufficiently inquired about the jurors' feelings concern-

ing police misconduct litigation generally. For example, he asked:

- . I'm sure, ladies and gentlemen, that you have read about allegations of police misconduct here in the city of Phoenix and perhaps other places.

 Are there any of you who believe that no action by a police officer could rise to the level of misconduct?

- Is there anyone here who feels that this type of action should not be permitted to go forward, that allegations of misconduct should be prohibited?

 Is there anyone here in this panel who feels that he or she has strong feelings about the type of this case either way, that would affect your ability to sit as fair and impartial jurors?

The judge also asked the jurors about their views concerning the parties involved in such cases-both the police department and the plaintiff. Finally, the judge inquired about excessive force claims against the police and about potential biases in favor of police officers. In fact, the voir dire is replete with inquiries about law enforcement officers as witnesses and the need to apply the same standard of credibility to all witnesses. These questions were reasonably sufficient to address potential bias. The district court had no obligation to ask the jurors about specific cases, such as those involving Rodney King and Edward Mallet. *See United States v. Powell*, 932 F.2d 1337, 1340 (9th Cir.1991) ("It is wholly within the judge's discretion to reject supplemental questions proposed by counsel if the voir dire is otherwise reasonably sufficient to test the jury for bias or partiality."). Indeed, mentions of King and Mallet may well have been prejudicial and inflammatory.

## II. JURY INSTRUCTIONS

 Monroe also argues that, compounding the problem with voir dire, the district court erroneously declined to give his requested jury instruction admonishing the jury not to give special credence to police testimony. He also argues that the district court failed to instruct the jury regarding the standard for police officers' use of deadly force. We review alleged errors in the formulation of jury instructions for abuse of discretion. *Beachy v. Boise Cascade Corp.*, 191 F.3d 1010, 1012 (9th Cir.1999), *cert. denied*, 529 U.S. 1021, 120 S.Ct. 1425, 146 L.Ed.2d 316 (2000).

### A. POLICE TESTIMONY

With respect to police testimony, Monroe requested the following jury instruction, which the judge rejected:

### POLICE OFFICER TESTIMONY

There was testimony in this case by law enforcement officers. The fact that a witness is a law enforcement official does not mean that his or her testimony is necessarily deserving of more or less consideration or greater or lesser weight than that of another witness. Any witness who takes the stand subjects his or her testimony to the same examination and the same tests as any other witness. You should recall the officer's demeanor on the stand, his or her manner of testifying, and the substance of the testimony. You must weigh and balance that testimony just as carefully as you would weigh the testimony of any other witness.

According to Monroe, because Sgt. Sherrard's testimony was critical to his defense but was uncorroborated, there was a danger of giving "unfair preference" to his testimony over Monroe's testimony. Monroe argues that the district court committed reversible error by not giving the instruction, particularly in light of the judge's decision not to question the jurors about Rodney King and Edward Mallet.

Instead of giving Monroe's proposed instruction, the court gave Ninth Circuit Model Civil Jury Instruction 3.7 (Credibility of Witnesses)[2] and, during voir dire, inquired extensively about the jury's understanding of the need not to "give any more or less weight to the testimony of a law enforcement officer" than to any other witness. The judge also emphasized that "[t]he important thing is that you apply the same standard of credibility to all of the witnesses as they testify."

■ Even if a special police officer credibility instruction might have been appropriate, Monroe failed to properly object at trial to the failure to give the proposed instruction. Under Federal Rule of Civil Procedure 51,

> [n]o party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection.

"We have interpreted this rule strictly and have stated that, '[i]n a civil case, we may not review a jury instruction in the absence of a proper objection.'" *McGonigle v. Combs*, 968 F.2d 810, 823 (9th Cir.1992) (quoting *Larez v. City of Los Angeles*, 946 F.2d 630, 638 (9th Cir.1991)); *accord Hammer v. Gross*, 932 F.2d 842, 847 (9th Cir.1991) (en banc) ("This court has enjoyed a reputation as the strictest enforcer of Rule 51 ... [and] ha[s] declared that

there is no 'plain error' exception in civil cases in this circuit.").

Monroe does not dispute that he failed to object at trial. Rather, he seeks relief under an exception to Rule 51. Although "[w]e have acknowledged a limited exception to [the] strict interpretation of Rule 51 ... [w]here the district court is aware of a party's concerns with an instruction, and further objection would be unavailing," *McGonigle*, 968 F.2d at 823, the exception does not apply here.

■ We grant exceptions to Rule 51 only when an objection would have been a "pointless formality." *United States v. Payne*, 944 F.2d 1458, 1464 (9th Cir.1991) (internal quotation marks and citation omitted). As we explained in *Payne:*

> [A]n objection may be a pointless formality when (1) throughout the trial the party argued the disputed matter with the court, (2) it is clear from the record that the court knew the party's grounds for disagreement with the instruction, and (3) the party offered an alternative instruction.

*Id.* (internal quotation marks and citation omitted). Here, Monroe simply submitted a proposed jury instruction. He did not take exception at any point and did not argue the issue in his trial brief, motions for judgment as a matter of law, or motion for new trial, nor did he otherwise make his position known to the district court.

---

**2.** The instruction states:

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may take into account:
1. the opportunity and ability of the witness to see or hear or know the things testified to;
2. the witness' memory;

3. the witness' manner while testifying;
4. the witness' interest in the outcome of the case and any bias or prejudice;
5. whether other evidence contradicted the witness' testimony;
6. the reasonableness of the witness' testimony in light of all the evidence; and
7. any other factors that bear on believability.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify.

Under these circumstances, Monroe may not avail himself of the exception.

## B. DEADLY FORCE

The next issue is whether the district court erred by declining Monroe's request for a deadly force jury instruction. Indeed, the judge did not give an instruction setting forth the standard for deadly force as described by the Supreme Court in *Garner,* 471 U.S. at 11–12, 105 S.Ct. 1694, even though the City proposed a proper *Garner* instruction.[3]

■ Under *Garner,* police use of deadly force is reasonable

> [w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.... Thus, if the suspect threatens the officer with a weapon ... deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

*Id.; accord Harris v. Roderick,* 126 F.3d 1189, 1201 (9th Cir.1997) ("[O]fficers may not shoot to kill unless, at a minimum, the suspect presents an immediate threat to the officer or others, or is fleeing and his escape will result in a serious threat of injury to persons."). In this circuit, under *Garner,* "deadly force is that force which is reasonably likely to cause death." *Vera Cruz v. City of Escondido,* 139 F.3d 659, 663 (9th Cir.1997).

Instead of giving a *Garner* instruction, the judge gave the model jury instruction for excessive force (Ninth Circuit Model Civil Jury Instruction 11.1.2):

> Plaintiff claims the defendant, by using excessive force in making a lawful arrest, deprived the plaintiff of the

Fourth Amendment constitutional right to be free from an unreasonable seizure.

The law enforcement officer has the right to use such force as is reasonably necessary under the circumstances to make a lawful arrest. An unreasonable seizure occurs when a law enforcement officer uses excessive force in making a lawful arrest.

Whether force is reasonably necessary or excessive is measured by the force a reasonable and prudent law enforcement officer would use under the circumstances.

■ An excessive force instruction is not a substitute for a *Garner* deadly force instruction. We have suggested that "jury instructions regarding excessive force under the Fourth Amendment do not suffice to inform the jury of the constitutionally permissible use of deadly force." *Fikes v. Cleghorn,* 47 F.3d 1011, 1014 (9th Cir. 1995). In *Fikes,* we explained the difference between the "excessive force" and "deadly force" standards:

> While the use of "force" is reasonable under the Fourth amendment if it would seem justified to a reasonable police officer in light of the surrounding circumstances, the use of "deadly force" is only justified if the officer has probable cause to believe that a suspect poses a threat of serious physical harm to the officer or others.

*Id.* at 1014 n. 2; *accord Brewer v. City of Napa,* 210 F.3d 1093, 1097–98 (9th Cir. 2000) (comparing *Garner* deadly force standard and *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), excessive force standard and con-

---

3. Although the City's proposed *Garner* instruction is not contained in the excerpts of record, it is part of the district court record. *See* CR 72. Therefore, we deny as unnecessary the City's motion to amend the record.

We also note that Monroe's proposed deadly force instruction was a misstatement of the law. Therefore, the district court did not err by rejecting it. *See Mitchell v. Keith,* 752 F.2d 385, 388 (9th Cir.1985).

cluding that "the existence or absence of probable cause lacks relevance outside the deadly force context described by *Garner*. ... [T]he existence of probable cause [is] a more specific and demanding standard" than the *Graham* standard); *Vera Cruz*, 139 F.3d at 661 ("the Supreme Court in *Garner* established a special rule concerning deadly force"); *Quintanilla v. City of Downey*, 84 F.3d 353, 357 (9th Cir.1996) ("*Garner* and *Graham* set forth somewhat different standards for proving a Fourth Amendment excessive force violation. The *Garner* standard, if not subsumed into the more general *Graham* formula, ... can apply only when deadly force has been used.") (citations omitted).

▆▆▆▆ Jury instructions "must allow the jury to determine the issues presented intelligently." *Fikes*, 47 F.3d at 1013. Here, because the district court never instructed the jury about the *Garner* deadly force standard, which was key to this case, the jury instructions did not "fairly and adequately cover the issues presented." *Gilbrook v. City of Westminster*, 177 F.3d 839, 860 (9th Cir.) (internal quotation marks and citation omitted), *cert. denied*, 528 U.S. 1061, 120 S.Ct. 614 (1999). Today we make clear that in a police shooting case such as this, where there was no dispute that deadly force was used, the district court abuses its discretion by not giving a *Garner* deadly force instruction.

▆▆▆ Here, however, the error was harmless. We have held that an instruction error in a civil case does not require reversal if it is "more probably than not harmless," noting that the harmless error standard in civil cases is "far less stringent" than that applied in criminal cases. *Lambert v. Ackerley*, 180 F.3d 997, 1008 & n. 11 (9th Cir.1999) (en banc) (internal quotation marks and citation omitted), *cert. denied*, 528 U.S. 1116, 120 S.Ct. 936, 145 L.Ed.2d 814 (2000); *accord Benigni v.*

*City of Hemet*, 879 F.2d 473, 480 (9th Cir.1988) (holding that district court's failure to give an instruction requested by the defendant was harmless because "the evidence would have supported a verdict for the plaintiff even with th[e requested] instruction").

Although the district court did not give a *Garner* deadly force instruction, it instructed the jury regarding deadly force under Arizona law. Specifically, the district court judge instructed the jury:

Under Arizona law, deadly force cannot legally be used by a police officer in self-defense unless the police officer believes that deadly physical force is immediately necessary to protect himself against the other's use or imminent use of unlawful deadly physical force.

*See* Ariz.Rev.Stat. §§ 13–405, 13–410(C). The parties agree that the instruction is a correct statement of the law. Under this standard, the jury found in favor of the City on the state law tort claims. In other words, the jury found by a preponderance of the evidence that Sgt. Sherrard "believe[d] that deadly physical force [was] immediately necessary to protect himself against [Monroe's] use or imminent use of unlawful deadly physical force." Although Sgt. Sherrard and Monroe waged a verbal standoff before the jury, given the verdict, the only logical conclusion is that the jury credited Sgt. Sherrard's testimony. The jury's finding on the Arizona law claims leads us to conclude that, consistent with the facts of this case (as credited by the jury), the jury must have concluded that Sgt. Sherrard had "probable cause to believe" that Monroe "pose[d] a threat of serious physical harm" to him or others. *Garner*, 471 U.S. at 11, 105 S.Ct. 1694. We therefore hold that the district court's error was harmless.

## III. RULE 50 MOTIONS

 Finally, Monroe argues that the district court should have granted his Rule 50 motions because he was unarmed during the alleged struggle with Sgt. Sherrard and did not pose a threat of serious physical harm. Specifically, Monroe argues that, construing the evidence in the light most favorable to Sgt. Sherrard, Sgt. Sherrard merely speculated that (1) Monroe might overpower him; (2) he (Sgt. Sherrard) might fall to the curb, hit his head, and become unconscious; and (3) Monroe might then reach for a weapon (his own or Sgt. Sherrard's) and use it to seriously injure or kill Sgt. Sherrard. We decline to embrace this recasting of the facts.

 Under Rule 50, the court may grant a motion for judgment as a matter of law

> [i]f during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue....

Fed.R.Civ.P. 50(a)(1). Judgment as a matter of law is proper when the evidence permits only one reasonable conclusion and the conclusion is contrary to that of the jury. *Forrett v. Richardson,* 112 F.3d 416, 419 (9th Cir.1997). "The evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party." *LaLonde,* 204 F.3d at 959. We review de novo the district court's denial of a motion for judgment as a matter of law. *Saman v. Robbins,* 173 F.3d 1150, 1155 (9th Cir.1999).

 We start with the proposition that use of deadly force by police officers is subject to the constraints of the Fourth Amendment. *Garner,* 471 U.S. at 7, 105 S.Ct. 1694. "Under the Fourth Amendment, police may use only such force as is objectively reasonable under the circumstances." *Cunningham v. Gates,* 229 F.3d 1271, 1288 (9th Cir.2000). Police use of deadly force is reasonable "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others" and, "where feasible, some warning has been given." *Garner,* 471 U.S. at 11–12, 105 S.Ct. 1694.

 The Fourth Amendment reasonableness test "requires careful attention to the facts and circumstances of each particular case, including ... whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham,* 490 U.S. at 396, 109 S.Ct. 1865. Whether the use of force is reasonable in a particular case

> must be judged from the perspective of a reasonable officer on the scene, rather than with the $^{20}/_{20}$ vision of hindsight.... The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Id.* at 396–97, 109 S.Ct. 1865; *accord LaLonde,* 204 F.3d at 962 ("In cold print, the events ... appear one way, but as they were unfolding ..., they surely had a different cast and immediacy.") (Trott, J., concurring in part and dissenting in part).

Construing the evidence in the light most favorable to the City, under the *Garner* standard, a reasonable juror could conclude that Sgt. Sherrard had probable cause to believe that Monroe posed a threat of serious physical harm to him. Even according to Monroe's account, Sgt. Sherrard knew that he had two knives in his pocket. Moreover, Sgt. Sherrard was

engaged in a physical struggle with Monroe and was unable to see Monroe's hands when he felt a tug on his gunbelt. Sgt. Sherrard therefore took his gun out of the holster, but he could not regain control-Monroe had his arms around him, Sgt. Sherrard was off balance, and Monroe refused to comply with his orders.

Although it is not our role to judge the tenseness of the situation or the fear experienced by Sgt. Sherrard, the testimony on these points is compelling, particularly when viewed through his eyes:

Q. Now, I want you to explain very carefully to me why you shot him.

A. This struggle, from the time that he hit me, to the time that I chased him that short distance, to the time we, you know, struggled back to the car, and then now we're in a physical wrestling match, I'm getting tired at this point, and I'm off balance.

I'm on the hood of the car. Every time he puts his back and starts to lift me [sic], I start sliding off the car. There's bumpers on the front of the car that are made out of angle iron that hold rubber bumpers for pushing. I don't know if I'm going to hit one of those as I slide off.

If I lose my balance and actually tumble off the front of the car, the curb was right there, I didn't know if [I] was going to hit my head.

He definitely was getting the better of me in this wrestling match. And I was afraid that I was going to fall down and that he would either get a weapon out, was in the process of getting a weapon out, I would hit my head and maybe lose control of my weapon. And he was not relinquishing it.

Anyway, at that point in time [I] made the decision to shoot him to end the confrontation before I got hurt.

Q. Did you feel that you were in danger, at the time you pulled the trigger, of seriously getting injured yourself, or maybe being killed yourself?

A. Absolutely.

In other words, Sgt. Sherrard made a "split second" judgment. Surely he was not required to wait and be seriously injured or killed before exercising his judgment and bringing the situation under control. A reasonable jury could conclude that Sgt. Sherrard had probable cause to believe that Monroe posed a threat of serious physical harm even though he did not actually have a weapon in his hand when Sgt. Sherrard shot him. *See Forrett*, 112 F.3d at 420 ("[T]he suspect need not be armed or pose an immediate threat to the officers or others at the time of the shooting.").

Finally, Monroe also claims that he is entitled to judgment as a matter of law with respect to his state law tort claims because: (1) he did not actually use deadly force against Sgt. Sherrard; (2) Sgt. Sherrard "admitted that there was no imminent use of deadly force" by Monroe against him; and (3) Sgt. Sherrard merely speculated that Monroe might use deadly force. As already discussed, there was sufficient evidence presented at trial for a reasonable jury to conclude that Sgt. Sherrard reasonably believed that deadly force was immediately necessary to protect himself against the use or imminent use of deadly force. Contrary to Monroe's characterization, Sgt. Sherrard never admitted that there was no imminent use of deadly force; rather, he merely admitted that he did not see exactly what Monroe was doing with his hands, an observation that is not inconsistent with the jury's defense verdict.

## CONCLUSION

Although Monroe attacks the trial process from jury selection through instruc-

tions and post-trial motions, we affirm because his challenges cannot be sustained as a matter of law. And, although he is correct with respect to error in the district court's failure to give a *Garner* deadly force instruction, under the circumstances here, that error was harmless.

**AFFIRMED.**