327 F.3d 876
 David H. OSTAD, Plaintiff-Appellee,
v.
OREGON HEALTH SCIENCES UNIVERSITY, an Oregon public corporation; Alan Seyfer, individually & in his official capacity as Chief of the Division of Plastic and Reconstructive Surgery, Defendants-Appellants.
 No. 00-36060.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted March 5, 2002.
 Filed April 28, 2003.
 
 COPYRIGHT MATERIAL OMITTED Barbee B. Lyon, Peter H. Koehler, Karin L. Guenther, and Scott G. Seidman, Tonkon Torp LLP, Portland, OR, for the defendants-appellants.
 Scott N. Hunt & Richard C. Busse, Busse & Hunt, Portland, OR, for the plaintiff-appellee.
 Appeal from the United States District Court for the District of Oregon; Ancer L. Haggerty, District Judge, Presiding. D.C. No. CV-98-01091-ALH.
 Before: B. FLETCHER, O'SCANNLAIN, and BERZON, Circuit Judges.
 Opinion by Circuit Judge BETTY B. FLETCHER. Opinion concurring in part, and dissenting in part by Circuit Judge
 BETTY B. FLETCHER, Circuit Judge.
 
 
 1
 Appellants Oregon Health Sciences University (OHSU) and Dr. Alan Seyfer appeal following a jury award of both compensatory and punitive damages in favor of Dr. David Ostad. We affirm.
 
 
 2
 Ostad, a former OHSU resident who worked under Seyfer, alleged that his termination from the residency program was motivated by Seyfer's retaliation against him for questioning Seyfer's billing practices. Appellants challenge, among other things, the district court's denial of their motion for judgment in their favor as a matter of law. They contend that the trial judge misapprehended the law applicable to mixed-motive First Amendment employment claims. We affirm the district court's determination that entry of judgment as a matter of law would be improper, as well as its formulation of jury instructions. We also affirm the district court's decision to admit certain testimony of Dr. Wheatley, one of Seyfer's colleagues.
 
 
 I. Factual Background & Procedural History
 
 
 3
 Ostad began a residency in the Plastic and Reconstructive Surgery Division of Oregon Health Sciences University (OHSU) on July 1, 1996. He had a one-year contract that was renewable for a second year.
 
 
 4
 Roughly two months into Ostad's rotation with Seyfer, chief of the division, Seyfer wrote Ostad a letter, dated January 16, 1997, criticizing Ostad's performance. The letter relayed complaints about Ostad from several doctors in OHSU's plastic surgery and emergency medicine divisions. Seyfer also detailed Ostad's problematic treatment of several patients, some of whom reportedly asked that Ostad no longer be permitted to treat them, and he described technical deficiencies with Ostad's work that he had observed personally. Seyfer warned that if Ostad's performance did not improve within a month, the resident would find himself on academic probation.
 
 
 5
 Ostad contends he was ordered to sign the letter and "get out" of the office and that he was not permitted to read the letter or discuss its contents with Seyfer. Seyfer points to Ostad's signature on the letter acknowledging, "I have read this letter carefully and agree to its contents. I will try to achieve the goals that Dr. Seyfer has outlined above."
 
 
 6
 During the same period, Ostad had raised questions about Dr. Seyfer's billing practices. OHSU could not legally bill Medicare and Medicaid for procedures performed by residents unless a teaching staff physician was present for the critical part of the procedure. Ostad claimed that Seyfer asked to be listed as the attending physician regardless of whether he was present when Ostad performed a procedure. Ostad testified that Seyfer became angry when challenged about the practice.
 
 
 7
 Two weeks after presenting the first letter, Seyfer gave Ostad a second letter detailing additional disappointment with Ostad's lack of knowledge and skill. Although the original letter had provided for review after a month, Seyfer informed Ostad that he was placing him on probation from the date of the letter, January 30, 1997, through the end of the following month.
 
 
 8
 Ostad testified at trial that Seyfer delivered the letter with a warning: "This is it.... You don't want to play the game.... Stop meddling in my business.... We need to be paid for what you do." Ostad contends that these statements referred to his complaints about Seyfer's billing practices. Ostad signed the letter, but this time acknowledged its receipt without agreeing to its contents.
 
 
 9
 On February 24, 1997 — one week prior to the scheduled termination of Ostad's academic probation — Seyfer presented the resident with yet another letter. This time the senior doctor detailed complaints from two other physicians who had observed Ostad while Seyfer was out of town. One physician alleged that Ostad had refused to come promptly to treat a patient with multiple facial fractures. The second recounted another patient's complaints about Ostad's treatment and her request that he not be permitted to participate in her care. Seyfer also noted problems with Ostad's treatment of another patient. Seyfer informed Ostad that he would be removed from the "on-call roster" so he would have time to respond to the accusations in writing by the end of the probationary period.
 
 
 10
 As requested, Ostad replied with a letter in which he responded to each of the accusations of Seyfer's letter of February 24. Ostad's letter did not mention Seyfer's billing practices.
 
 
 11
 Seyfer wrote still another letter on March 3, 1997. In it, he described deficiencies with Ostad's treatment of several patients. Ostad again signed to acknowledge receipt. The next day, Seyfer gave Ostad a letter placing him on administrative leave through the end of his one-year residency. Ostad, who refused to sign his name to the letter, testified that, when handing him the letter, Seyfer told him that he had "meddled in [Seyfer's] business too much."
 
 
 12
 Ostad requested a hearing, as was his right under OHSU regulations. OHSU convened a panel of five doctors — none of them plastic surgery specialists — to consider a formal Notice of Proposed Termination compiled from Seyfer's letters. Because of the panel's lack of familiarity with plastic surgery, Dr. Thornburg, the chair of the panel, confirmed at trial that the group depended heavily on Seyfer for a description of procedures and an assessment of how a junior resident should perform.
 
 
 13
 The two-day hearing provided many of the elements of due process that would be afforded a party at trial. Ostad was represented by counsel, was permitted discovery, and was allowed to cross-examine witnesses who testified under oath. Ostad was not, however, permitted to subpoena witnesses. He therefore was unable to compel the testimony or participation of two physicians who were Seyfer's colleagues and had supervised Ostad and reviewed him favorably.
 
 
 14
 Seyfer's testimony took up 217 pages of the hearing's 403-page transcript and included hearsay about other doctors' assessments of Ostad. Ostad, who was answering the charges against him put forth by OHSU, presented no evidence about Seyfer's allegedly improper billing practices. The panel's Opinion and Order made several factual findings and recommended that Ostad be terminated. Consistent with the panel's recommendation, OHSU chief administrative officer Roy Vinyard terminated Ostad's residency.
 
 
 15
 Ostad filed suit pursuant to 42 U.S.C. § 1983, alleging that Seyfer and OHSU had violated his First Amendment right to freedom of speech. At trial, Ostad was able to present witnesses who complimented his performance as well as witnesses who criticized Seyfer's billing practices — evidence unavailable to the OHSU panel that recommended his termination.
 
 
 16
 There was ample evidence to suggest that Seyfer was motivated by animus in response to Ostad's protected speech about his billing practices. Ostad testified to 30 to 40 incidents in which he challenged Seyfer about his billing practices. Jurors also heard Ostad's recollection of several explosive statements he alleged Seyfer made in response to Ostad's criticisms.
 
 
 17
 The jury returned a special verdict against both OHSU and Seyfer. The jury concluded that Ostad proved that the defendants had retaliated against him for exercising his free speech rights. The jury also found that OHSU and Seyfer failed to prove that Ostad "would have been terminated from OHSU's plastic surgery program for other reasons even in the absence of his protected speech activity." The jury recommended an award of $32,000 in past economic damages, $150,000 in non-economic damages, and no future economic damages. The jury determined that Seyfer should pay Ostad an additional $200,000 in punitive damages. Because the district court had ruled previously that the jury's ruling on future economic damages would be advisory only, the court entertained further written argument before issuing an order granting Ostad $90,000 for future economic loss.
 
 
 18
 Pursuant to Fed.R.Civ.P. 50(b), OHSU and Seyfer moved for judgment as a matter of law or, in the alternative, a new trial pursuant to Fed.R.Civ.P. 59. The district court denied both requests. We have jurisdiction pursuant to 28 U.S.C. § 1291.
 
 
 II. Discussion
 
 
 A. Judgment as a Matter of Law
 
 
 19
 OHSU and Seyfer contend that they were entitled to judgment as a matter of law because Ostad failed to produce sufficient evidence that the exercise of his right to free speech played a role in his termination. The appellants explain that, although Seyfer may have been motivated by animus based on Ostad's speech, he ultimately did not terminate Ostad. That decision was left to the chief administrative officer acting on the recommendation of the Hearing Committee, which had no knowledge of Ostad's complaints about billing practices and, thus, could not have been motivated by unconstitutional reasons to make its termination recommendation. Therefore, appellants argue, neither Seyfer nor OHSU should be liable because the Hearing Committee's unbiased decision cut off the chain of causation between Seyfer's improper motives and Ostad's ultimate termination.
 
 
 20
 We need not consider whether the question of OHSU's liability raises distinct issues from the question of Seyfer's liability. OHSU has never contended that its liability must be considered separately. Rather, OHSU expressly disavowed the position at oral argument by insisting that its position and Seyfer's were identical. Accordingly, we deem that OHSU has waived any right to have its liability analyzed separately from that of Seyfer.[1]
 
 
 21
 We review the denial of a motion for a judgment as a matter of law de novo. See Monroe v. City of Phoenix, 248 F.3d 851, 861 (9th Cir.2001). We must view the evidence in the light most favorable to the nonmoving party — here, Ostad — and draw all reasonable inferences in that party's favor. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149-50, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Judgment as a matter of law is proper when the evidence permits only one reasonable conclusion and the conclusion is contrary to that reached by the jury. Monroe, 248 F.3d at 861. Seyfer and OHSU contend that no reasonable jury could find that Seyfer retaliated against Ostad for his speech by terminating him because that decision was left to the Hearing Committee. Ostad contends that Seyfer and OHSU may be held liable under § 1983.
 
 Section 1983 provides in pertinent part:
 
 22
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured in an action at law[.]
 
 
 23
 42 U.S.C. § 1983. The Supreme Court specified the proper framework for analyzing claims of illegal retaliation for the exercise of protected speech in Mount Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) (hereinafter Mt. Healthy). The Court enunciated a burden shifting test in which a plaintiff must show that (1) his conduct is constitutionally protected and (2) that the protected conduct was a "substantial" or "motivating" factor in the decision to take an adverse action against him. Id. at 287, 97 S.Ct. 568. If a plaintiff meets these burdens, the defendant must show, by a preponderance of the evidence, that it would have reached the same decision as to the adverse action even in the absence of the protected conduct. Id.
 
 
 24
 The Court explained that it was concerned that an employee be "placed in no worse a position than if he had not engaged in the conduct." Id. at 285-86, 97 S.Ct. 568. But the Court also reasoned:
 
 
 25
 A borderline or marginal candidate should not have the employment question resolved against him because of the constitutionally protected conduct. But that same candidate ought not to be able, by engaging in such conduct to prevent his employer from assessing his performance record and reaching a decision not to rehire him on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision.
 
 
 26
 Id. at 286, 97 S.Ct. 568. The Court's concerns must guide our application of its test. Seyfer and OHSU concede that Ostad's conduct with regard to Seyfer's billing practices was protected under the First Amendment. Accordingly we must determine whether the jury properly could have found, on the record before it, that Ostad's protected conduct played a substantial or motivating factor in the decision to terminate his residency.
 
 
 27
 For the purposes of determining Seyfer's liability, the appellants contend that the Hearing Committee's independent decision severed any link between Seyfer's allegedly improper motives and Ostad's termination. We disagree.
 
 
 28
 In Gilbrook v. City of Westminster, 177 F.3d 839 (9th Cir.1999), a case in which the plaintiffs alleged, inter alia, that they were terminated for the exercise of speech protected by the First Amendment, we addressed whether the decision by a superior to uphold a discharge automatically immunized a subordinate from liability for retaliatory acts that ultimately led to the discharge. We aligned ourselves with the Fifth, Sixth, and Tenth Circuits and held that "a subordinate cannot use the nonretaliatory motive of a superior as a shield against liability if that superior never would have considered a dismissal but for the subordinate's retaliatory conduct."[2] Id. at 855. However, we stressed that the ultimate question of the liability of the subordinate "is an intensely factual one, the results of which will vary depending on the circumstances." Id. We specified:
 
 
 29
 We do not hold that a final decision-maker who lacks any improper motive never can absolve a subordinate of liability for his or her retaliatory acts, any more than we hold that such a decision-maker always can absolve the subordinate. Indeed, we express no opinion as to what the result should be, as a matter of law, if the facts showed that the final decision-maker made a wholly independent, legitimate decision to discharge the plaintiff, uninfluenced by the retaliatory motives of a subordinate.
 
 
 30
 Id. (emphasis in original).
 
 
 31
 Here, the jury had ample evidence of Seyfer's bias and its role in the process of terminating Ostad's participation in OHSU's residency program: The jury heard evidence that indicated that Seyfer threatened Ostad for challenging improper billing practices; that Seyfer wrote a number of letters that laid the groundwork for and initiated the discipline hearings that resulted in Ostad's termination; that the Hearing Board, without any independent experience in plastic surgery, substantially relied on Seyfer's expertise and testimony to reach the decision to terminate Ostad's residency; and that Ostad himself was prevented from adducing evidence to rebut Seyfer's conclusions about his performance. The jury also specifically found that OHSU and Seyfer failed to prove that Ostad "would have been terminated from OHSU's plastic surgery program for other reasons even in the absence of his protected speech activity." On these facts, even assuming, for the sake of argument, that OHSU's hearing committee did not share Seyfer's improper motives in terminating Ostad, Gilbrook indicates that Seyfer properly may be held liable. Thus, as to Seyfer, the district court's denial of the motion for judgment as a matter of law was entirely correct.
 
 
 32
 Because OHSU has waived any right to have its liability considered apart from that of Seyfer, the finding of liability against the university also was proper.
 
 
 B. Jury Instructions
 
 
 1. Substantial or Motivating Factor Instruction
 
 
 33
 Seyfer and OHSU argue that they are entitled to a new trial because the district court gave the jury an improper instruction on the meaning of "substantial or motivating" under Mt. Healthy. We review a decision to deny a Rule 59 motion for a new trial for an abuse of discretion. See Silver Sage Partners v. City of Desert Hot Springs, 251 F.3d 814, 818 (9th Cir. 2001). Likewise, we review a district court's formulation of jury instructions for an abuse of discretion. See Monroe, 248 F.3d at 857. However, if a party alleges that the trial court misstated the elements that must be proved at trial, we review the issue de novo as a matter of law. See Voohries-Larson v. Cessna Aircraft Co., 241 F.3d 707, 713 (9th Cir.2001).
 
 
 34
 Mt. Healthy requires that a plaintiff prove that protected speech was a "substantial" or "motivating" factor in the termination decision. Mt. Healthy, 429 U.S. at 287, 97 S.Ct. 568. The written jury instructions indicated that Ostad had to prove by a preponderance of the evidence:
 
 
 35
 (1) THAT DR. SEYFER WAS AWARE, PRIOR TO THE TIME THAT HE RECOMMENDED THE PLAINTIFF'S TERMINATION, THAT DR. OSTAD HAD QUESTIONED DR. SEYFER'S BILLING PRACTICES.
 
 
 36
 (2) THAT THIS QUESTIONING WAS A SUBSTANTIAL OR MOTIVATING FACTOR IN THE DECISION TO DISCHARGE THE PLAINTIFF FROM OHSU'S PROGRAM; AND
 
 
 37
 (3) THAT THE DEFENDANTS' ACTS WERE THE PROXIMATE OR LEGAL CAUSE OF DAMAGES SUSTAINED BY THE PLAINTIFF.
 
 
 38
 The court clearly instructed the jury that it was the defendants' burden to show that they would have terminated Ostad even in the absence of any protected activity:
 
 
 39
 IF YOU FIND IN THE PLAINTIFF'S FAVOR ON EACH OF THE FACTS THAT THE PLAINTIFF MUST PROVE, YOU MUST THEN CONSIDER WHETHER THE DEFENDANTS HAVE SHOWN BY A PREPONDERANCE OF THE EVIDENCE THAT PLAINTIFF WOULD HAVE BEEN TERMINATED FROM THE PROGRAM FOR OTHER REASONS EVEN IN THE ABSENCE OF PLAINTIFF'S QUESTIONS REGARDING DR. SEYFER'S BILLING PRACTICES. IF YOU FIND THAT DEFENDANTS HAVE PROVEN THAT PLAINTIFF WOULD HAVE BEEN TERMINATED BECAUSE OF UNSATISFACTORY PERFORMANCE AS A RESIDENT, REGARDLESS OF HIS QUESTIONING OF DR. SEYFER'S BILLING PRACTICES, THEN YOUR VERDICT SHOULD BE FOR THE DEFENDANTS.
 
 
 40
 The verdict form required the jurors to answer specifically "DID THE DEFENDANTS PROVE THAT PLAINTIFF WOULD HAVE BEEN TERMINATED FROM OHSU'S PLASTIC SURGERY PROGRAM FOR OTHER REASONS EVEN IN THE ABSENCE OF HIS PROTECTED SPEECH ACTIVITY?" The jury placed a check on the line next to the answer "No."
 
 
 41
 However, before reaching a verdict, in a unanimous note, the jury asked the judge to "please clarify the definitions of `substantial' & `motivating' on line 16, page 10 of the final instructions." Relying on Knickerbocker v. City of Stockton, 81 F.3d 907, 911 (9th Cir.1996), the defendants requested that the jury be instructed that: "An improper motive is a `substantial or motivating' factor in the termination if the termination would not have occurred except for the improper motive." Ostad requested an instruction that "[t]he term `substantial or motivating factor' refers to a factor that played a part in an employment decision." Instead of adopting either side's proposal, the district court informed the jurors simply that "a substantial or motivating factor is a significant factor."
 
 
 42
 In Knickerbocker — a mixed-motive case that did not involve jury instructions — we held that "[p]rotected activities are a `substantial factor' where the adverse actions would not have been taken `but for' the protected activities." 81 F.3d at 911. We also stressed, however, that in "dual motive cases, it is the defendant's affirmative burden to prove that it would have taken the adverse action if the proper reason alone had existed." Id. Once a plaintiff has demonstrated that the retaliatory motive was a "substantial" or "motivating" factor the defendant, under Mt. Healthy, must then prove that the adverse action would have occurred anyway.
 
 
 43
 Accordingly, the "but for" statement in Knickerbocker is not inconsistent with the instructions the court provided to the jury in the case at hand. The jurors, received explicit instructions that mirrored Mt. Healthy's language. They were instructed as to each of the elements the plaintiff must prove before the burden shifts to the defendants to demonstrate that OHSU would have fired Ostad regardless of his protected conduct.
 
 
 44
 Even if the district court's clarification to the jury was less than illuminating, the requirement that the jurors agree that the improper motive was a "significant" factor does not misstate the law. To the contrary, it reinforces Mt. Healthy's and Knickerbocker's holdings that the defendants bear the burden of establishing their affirmative defense and that it would be improper to require that a plaintiff surmount it as part of the "substantial or motivating" factor analysis.
 
 
 2. Causation Instruction
 
 
 45
 OHSU and Seyfer also argue that the district court improperly instructed the jury on causation. In its oral instructions, the court explained:
 
 
 46
 You may find that plaintiff's protected speech was a motivating factor in his termination, even if the final decision-makers at plaintiff's termination hearing were not motivated to retaliate against plaintiff, if you find that the person who set in motion the chain of events that led to plaintiff's termination was motivated to retaliate against plaintiff for his protected speech.
 
 
 47
 This instruction is completely consistent with the teachings of Gilbrook and Willis that allow imposition of liability even though the decision-maker may be ignorant of its subordinate's retaliatory motive. Seyfer and OHSU wanted the court to instruct the jury that the plaintiff had to prove that the retaliatory motive "compromised the independent judgment of the hearing committee." Such an addition was not necessary. The instruction as presented did not misstate the law. Combined with the "substantial or motivating" factor instruction, this instruction told jurors that they could find that Seyfer's influence over the process was such that the Hearing Committee's lack of information about Ostad's protected conduct and Seyfer's bad motives did not cut off the chain of causation.
 
 
 48
 Likewise, the appellants' complaint about instructions with respect to the Hearing Committee's role is unavailing. The trial court told jurors:
 
 
 49
 The law provides that a subordinate cannot use the nonretaliatory motive of a superior as a shield against liability if the supervisor never would have considered a dismissal but for the subordinate's retaliatory conduct.
 
 
 50
 This is completely consistent with precedent of the Supreme Court and our circuit.
 
 
 51
 Because the challenged jury instructions did not mis-state the law, the district court did not abuse its discretion in denying Seyfer and OHSU a new trial.
 
 
 C. Hearsay Evidence
 
 
 52
 Finally, Seyfer and OHSU complain that trial testimony offered by Dr. Wheatley, one of Ostad's witnesses and a colleague of Seyfer, was hearsay that was improperly admitted. Ostad maintains that the testimony was based on Wheatley's personal knowledge. We review the evidentiary rulings below for an abuse of discretion. See Freeman v. Allstate Ins. Co., 253 F.3d 533, 536 (9th Cir.2001). Similarly, the trial court's decision to admit or exclude evidence based on the hearsay rule is reviewed for an abuse of discretion. See Hagood v. Sonoma County Water Agency, 81 F.3d 1465, 1479 n. 24 (9th Cir.1996).
 
 
 53
 We conclude that none of the statements, the admission of which appellants challenge, was hearsay. When he was asked if he had "some concerns about billing irregularities in the department," Dr. Wheatley replied, "Yes." Asked whether those concerns affected his willingness to work with Seyfer, Wheatley answered, "[a]s a result of my concerns about billings, yes, I prefer not to work with Dr. Seyfer." Neither of these statements referred to an out-of-court statement. Therefore they were not hearsay. Fed. R.Evid. 801(c). The fact that Wheatley indicated that Jill Cline, a billing clerk, was the source of some of his concerns does not make his statements about his own feelings with respect to Seyfer hearsay: So long as he testified to his personally held beliefs and he was not discussing an out-of-court statement, Wheatley could testify regardless of what sources might have informed him. See Fed.R.Evid. 602 (requiring a witness to have personal knowledge of matters to which he testifies).
 
 
 54
 Seyfer and OHSU also allege that Wheatley's statements about Cline were inadmissible hearsay. We disagree. During her own testimony, Cline denied that she had ever expressed concerns about Seyfer's billing to any of the staff physicians. Wheatley testified that Cline in fact had spoken to him about her concerns regarding Seyfer's billing. These statements were not offered to prove that Seyfer did, in fact, bill improperly. Instead, they were offered to impeach Cline's testimony. Thus, they were not hearsay. See Fed.R.Evid. 801(c).
 
 
 55
 Accordingly, we hold that the trial court was correct to admit Wheatley's testimony.
 
 
 III. Conclusion
 
 
 56
 We find that appellants' arguments are entirely without merit. The district court correctly denied appellants' motion for judgment as a matter of law as to Seyfer, and OHSU has waived any right to have its liability considered independently. The jury instructions properly stated the law that governs liability for First Amendment retaliation, and the district court's evidentiary rulings were entirely proper. Accordingly, the judgment of the district court is
 
 
 57
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 We note that OHSU also has not raised and therefore has waived any possible claim of Eleventh Amendment immunitySee In re Bliemeister, 296 F.3d 858, 861-63 (9th Cir. 2002) (holding that a state waived immunity by participating in bankruptcy proceedings without raising the immunity issue). We also note that defense counsel represents both Seyfer and OHSU, despite their apparently divergent interests.
 
 
 [2]
 We noted that such a conclusion was consistent with our earlier holding inJohnson v. Duffy, 588 F.2d 740, 743-44 (9th Cir.1978), in which we found liability under § 1983 proper because the "requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury."
 
 
 
 58
 O'SCANNLAIN, Circuit Judge, concurring in part and dissenting in part:
 
 
 59
 I agree that the district court did not err in denying the motion for judgment as a matter of law (and that OHSU has waived any right to have its liability considered separate from that of Seyfer's). Furthermore, I agree that the district court did not abuse its discretion in any of the contested evidentiary rulings. Accordingly, I concur in Parts I, II-A, II-B.2, and II-C of the opinion. However, because I would hold that Seyfer and OHSU are entitled to a new trial on the basis of an improper jury instruction, I must dissent from Part II-B.1.
 
 
 60
 "Under the dual motive test, a plaintiff must show that her protected activities were a `substantial factor' in the complained of adverse employment action. Protected activities are a `substantial factor' where the adverse actions would not have been taken `but for' the protected activities." Knickerbocker v. City of Stockton, 81 F.3d 907, 911 (9th Cir.1996). Our decision in Gilbrook v. City of Westminster, 177 F.3d 839 (9th Cir.1999), reaches a similar conclusion: "[A] subordinate cannot use the nonretaliatory motive of a superior as a shield against liability if that superior never would have considered a dismissal but for the subordinate's retaliatory conduct." Id. at 855 (emphasis added). Seyfer and OHSU requested a jury instruction to this effect,[1] which the district court denied. As it was a correct statement of the law, the district court's failure to give it was an abuse of discretion that was not harmless.
 
 
 61
 The district court did properly instruct the jury that in order to prevail on the retaliation claim, Ostad's protected activities had to be a "substantial or motivating factor" in his termination. Unfortunately, in response to a query from the jury concerning the definitions of "substantial" and "motivating," the court erred in subsequently instructing the jurors that the protected conduct needed only to be a "significant factor" in the termination. This latter instruction sets the bar too low as a matter of law.
 
 
 62
 Failure to require that the subordinate's retaliatory conduct have played a substantial role in the unbiased decisionmaker's deliberations runs the risk of immunizing a plaintiff who rightfully should be terminated. If a malevolent subordinate brings genuine misconduct to the attention of an unbiased decisionmaker, that decisionmaker should still be able to terminate the plaintiff for the unrelated malevolence. It is precisely for such circumstances that the burden of establishing liability is considerably higher than a finding that the protected activities were only "a significant factor."
 
 
 63
 Therefore, I would reverse the district court and remand for a new trial so that a jury could evaluate Seyfer's and OHSU's conduct under the proper legal standard.
 
 
 
 Notes:
 
 
 [1]
 The defendants requested the following jury instruction: "An improper motive is a `substantial or motivating' factor in the termination if the termination would not have occurred except for the improper motive."Supra at 884.