**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GWEN PRICE, Personal
Representative of the Estate of
James Jahar Perez, deceased,
JAMES JAHAR PEREZ, JR., by and
through his guardian ad litem,
Gwen Price; DEBORAH PEREZ, an
individual; JAMES JAHAR PEREZ, JR.,
by and through his guardian ad
litem, Gwen Price,
                    *Plaintiffs-Appellants,*

                    v.

JASON SERY; CITY OF PORTLAND, a
municipal corporation; SEAN
MACOMBER,
                    *Defendants-Appellees.*

No. 06-35159

D.C. No.
CV-04-01178-
MWM

OPINION

Appeal from the United States District Court
for the District of Oregon
Michael W. Mosman, District Judge, Presiding

Argued and Submitted November 13, 2006
Submission withdrawn April 5, 2007
Resubmitted November 1, 2007
Portland, Oregon

Filed January 22, 2008

Before: Diarmuid F. O'Scannlain, Edward Leavy, and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge O'Scannlain
Partial Concurrence and Partial Dissent by Judge Fisher

781

## **COUNSEL**

Elden M. Rosenthal, Rosenthal & Greene, P.C., Portland, Oregon, argued the cause and filed briefs for the plaintiffs-appellants.

Harry Auerbach, Office of Chief Deputy City Attorney, Office of City Attorney, Portland, Oregon, argued the cause and filed a brief for the defendants-appellees.

---

**OPINION**

O'SCANNLAIN, Circuit Judge:

The constitutionality of the City of Portland's policy on the use of deadly force by its police officers is squarely presented by this appeal from grant of summary judgment by the decedent's estate.

I

On March 28, 2004, in the course of a routine traffic stop, City of Portland, Oregon Police Officer Jason Sery shot and killed James Jahar Perez, the driver of the stopped vehicle. Certain key facts surrounding the shooting are in dispute, but they are not relevant to this limited appeal. The district court, however, found a number of facts to be undisputed, which we recite here to provide adequate context.

A

Sery and another officer, Sean Macomber were on a routine patrol in the St. John's neighborhood of North Portland on Sunday afternoon, March 28, 2004, when Macomber noticed a white luxury sedan with tinted windows and chrome wheels that struck him as atypical "for cars driven in that working class neighborhood." The officers were aware of local complaints of illegal drug activity, and drove by the car for a closer look. Upon running a registration check and learning that the car was registered to a man born in the 1950s, Macomber concluded that the age of the driver did not match. He also felt that the car's two occupants "appeared nervous and did not want to make eye contact."

As the officers drove by, the car remained stopped at a stop sign, leading Macomber to suspect that the driver was waiting to leave the area without being observed by the officers. After passing the car, the officers temporarily lost visual contact with it. When the officers regained sight of the car, the driver was now the sole occupant. The officers witnessed the driver signal and make a right turn into a strip mall parking lot, but it did not comply with Oregon traffic laws requiring vehicles to signal continuously for at least 100 feet prior to executing a turn. Macomber parked the patrol car behind the parked car, blocking it from any means of exit.

Although what transpired after the officers exited their patrol car and confronted Perez is disputed and awaits determination by a jury, it is undisputed that no more than 25 seconds elapsed from the time the officers left their patrol car until the time that Sery shot Perez. At the time of his death, Perez's seatbelt remained fastened, and he was unarmed.

B

Gwen Price ("Price"), on behalf of Perez's estate and his son, and Deborah Perez, sued Sery, Macomber, and the City of Portland ("City") under 42 U.S.C. § 1983, alleging that the officers unconstitutionally used deadly force for which the City is liable under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). In addition, the complaint alleged a state law claim for wrongful death based on negligent acts of the officers and the City, and other claims not relevant to this appeal.

Because the Portland Police Bureau's ("PPB") policy, training, and discipline practices with respect to the use of lethal force are relevant to the constitutional claims, we recite them as well. The use of deadly force is governed by PPB General Order ("G.O.") § 1010.10, which reads in relevant part as follows:

The Bureau recognizes that members may be required to use deadly force when their life or the life of another is jeopardized by the actions of others. Therefore, state statute and Bureau policy provide for the use of deadly force under the following circumstances:

    a.  Members may use deadly force to protect themselves or others from what they reasonably believe to be an immediate threat of death or serious physical injury.

    b.  A member may use deadly force to effect the capture or prevent the escape of a suspect where the member has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the member or others.

    c.  If feasible, some warning has been given.

Members must be mindful of the risks inherent in employing deadly force. A member's reckless or negligent use of deadly force is not justified in this policy or State statute. Members are to be aware that this directive is more restrictive than state statutes.

G.O. § 1010.10.

## C

Because we are reviewing a district court's ruling on a motion for summary judgment, we must also consider facts alleged but not yet proven in order to decide this appeal.[1] In

---

[1]On a motion for summary judgment, all reasonable inferences are drawn in favor of the non-moving party. *Anderson v. Liberty Lobby*, 477

particular, Price's complaint makes allegations concerning the City's history of disciplining officers for the inappropriate use of deadly force, as well as its training of officers. Price alleges specifically that, according to Portland Chief of Police Derrick Foxworth's deposition, no Portland police officer has "ever" been "successfully disciplined" for shooting at an unarmed citizen "in the last twenty years." But as District Judge Mosman's opinion notes, Chief Foxworth's second affidavit in the case, filed under seal, indicates that Chief Foxworth has demoted at least one officer for inappropriate use of deadly force, that former Chief Mark Kroeker disciplined an officer for unsatisfactory performance leading to the use of deadly force, and that former Chief Charles Moose terminated an officer for firing at a fleeing suspect without justification. The record also reflects that some decisions by the PPB to discipline officers have been overturned by arbitrators.

Price's pleading further cited a report issued by the Police Assessment Resource Center ("PARC") in August 2003. The findings of the PARC report, as presented by Price, did not reveal a failure to discipline officers but posited a need for improvement in the PPB's approach to reviewing deadly force incidents. In addition to the PARC report, Price submitted the declaration of an expert in police tactics, Thomas Streed, Ph.D. Streed's Declaration ("Streed Declaration") asserts that, after reviewing 30 police shootings over the past 20 years, "at least fifteen" were not based on "probable cause." Streed repeats the contention that no officer has "ever" been disciplined by the PPB for the use of lethal force, though he does acknowledge two unsuccessful attempts to discipline.

U.S. 242, 255 (1986). A district court properly grants summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ.P. 56(c).

Price also made allegations concerning the City's training of police officers in the use of deadly force. She relies on the Streed Declaration to contend that the City's use of so-called "no-win" scenarios, together with its deadly force policy (also a part of training), creates a mind-set encouraging officers to "shoot first" and ask questions later. The Streed Declaration devotes just one paragraph to the City's training program, and bases its conclusion that PPB training is "particularly" likely to lead to shooting of unarmed persons in significant part upon a distinction between "reasonable belief" and "probable cause," as used in the PPB G.O. § 1010.10 (quoted above).

D

Price moved for partial summary judgment on her *Monell* claims, and the City moved for summary judgment on all claims. The district court denied Price's motion, granted the City's motion for summary judgment as to the *Monell* claims, and denied the City's motion for summary judgment on the state law negligence claims. Pursuant to Fed. R. Civ. P. 54(b), the district court entered a final judgment as to the *Monell* claims, so that this appeal could be decided prior to a jury trial on the related unresolved issues.

II

Price offers three principal arguments that the City is liable under *Monell* for the alleged violation of Perez's rights under the Fourth Amendment by the use of deadly force against him. We consider each in turn.

A

The Supreme Court has held that municipalities may be held liable as "persons" under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell*, 436 U.S. at

694. A plaintiff may also establish municipal liability by demonstrating that (1) the constitutional tort was the result of a "longstanding practice or custom which constitutes the standard operating procedure of the local government entity;" (2) the tortfeasor was an official whose acts fairly represent official policy such that the challenged action constituted official policy; or (3) an official with final policy-making authority "delegated that authority to, or ratified the decision of, a subordinate." *Ulrich v. City & County of San Francisco*, 308 F.3d 968, 984-85 (9th Cir. 2002).

Price first contends that, as written, the City's official policy governing the use of lethal force by police officers violates the Fourth Amendment's requirements, as explicated by the Supreme Court in *Tennessee v. Garner*, 471 U.S. 1 (1985). Specifically, Price argues that the City's policy, expressed in G.O. § 1010.10, that an officer "reasonably believe" a suspect poses an immediate threat of serious physical injury or death falls short of the "probable cause" requirement set forth in *Garner* and this court's precedents. 471 U.S. at 11-12; *Brewer v. City of Napa*, 210 F.3d 1093, 1098 (9th Cir. 2000) (referring to *Garner*'s "probable cause" deadly force standard as a "more specific and demanding standard" than *Graham*'s excessive force standard for the use of non-lethal force ).

Price contends that the Supreme Court's decision in *Garner* sets a requirement of "objective probable cause" for any use of deadly force by a police officer. Price notes that the City's policy requires "objective probable cause" in the case of fleeing suspects, whereas for cases where an officer fears an imminent threat of death or serious physical injury, the City's policy only requires that the officer "reasonably believe" that he or she is confronted by an immediate threat. Price argues that "reasonable belief" is a different, and lesser, standard from "probable cause."

1

**[1]** Both *Garner* and *Graham v. O'Connor*, 490 U.S. 386 (1989) are recognized as the leading Supreme Court cases explicating the requirements for the use of force by law enforcement officers under the Fourth Amendment. In *Garner*, the Supreme Court for the first time considered the constitutionality of the common law rule permitting the use of lethal force to prevent the escape of a fleeing felon (but not of a misdemeanant). The Court held that the Fourth Amendment's reasonableness standard required "probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others" before using deadly force. *Garner*, 471 U.S. at 11. In its lengthy analysis leading to this conclusion, the Court noted that the movement away from the common law rule in a number of states suggested that what was "reasonable" was not frozen in time with the common law. *Id.* at 13-20. In particular, the Court found it significant that police departments were "overwhelmingly" moving away from the common law rule. *Id*. at 18. Indeed, it quoted approvingly from the Commission on Accreditation for Law Enforcement Agencies' language restricting the use of deadly force "to situations where the officer *reasonably believes* that the action is in defense of human life . . . or in defense of any person in immediate danger of serious physical injury." *Id.* (internal quotation marks omitted and emphasis added).

The narrow question in *Garner* was therefore whether, to justify the use of deadly force, an officer must believe only that a suspect is fleeing or also that the suspect represents a serious and immediate threat to the officer or others. In either case, the Court assumed that the belief would have to be reasonable, an inquiry that under the Fourth Amendment always depends upon objective factors and not upon sincerity of belief.

2

In *Graham*, the question was whether excessive force claims (a broader category than deadly force claims) should be analyzed as substantive due process claims or as Fourth Amendment claims. *Graham*, 490 U.S. at 388. Chief Justice Rehnquist referred in a general way to the Fourth Amendment as requiring an "objective reasonableness" standard—not matching perfectly either the "reasonable belief" or "objective probable cause" formulations. *Id.*

The *Graham* Court clarified that the reasonableness inquiry turned upon the circumstances confronting the officer, rather than the officer's subjective beliefs or intentions: "As in other Fourth Amendment contexts, however, the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard for their underlying intent or motivation." *Id.* at 397.

**[2]** The *Garner* and *Graham* decisions are the Court's leading cases bringing claims about the use of force—deadly or allegedly excessive—by law enforcement officers under the rubric of modern Fourth Amendment search-and-seizure analysis, rather than under the common law or substantive due process. Both cases focused on the "totality of the circumstances" and the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396; *see also Garner*, 471 U.S. at 9.

3

**[3]** In this light, the Supreme Court's careful discussion of "probable cause" in a recent Fourth Amendment arrest context in *Maryland v. Pringle*, 540 U.S. 366 (2003), is instructive. There, Chief Justice Rehnquist, the author of *Graham*, wrote that "[t]he probable-cause standard is incapable of pre-

cise definition or quantification into percentages because it deals with the probabilities and depends on the totality of the circumstances" and "the substance of all the definitions of probable cause is a reasonable ground for belief." *Pringle*, 540 U.S. at 371 (internal quotation marks and citations omitted). *Pringle* does not address "probable cause" in the context of the use of deadly force by law enforcement officers. Nevertheless, the phrase "probable cause" itself should not mean one thing in one context and something different elsewhere. Rather, what an officer has probable cause to believe dictates the level of force he may justifiably use in a given scenario. In other words a law enforcement officer's use of force will be justified, or not, by what that officer reasonably believed about the circumstances confronting him.

The Supreme Court very recently confirmed and clarified this analysis of the relationship between *Garner*, *Graham*, and the Fourth Amendment's reasonableness requirement in *Scott v. Harris*, 127 S. Ct. 1769 (2007). In considering the reasonableness of a police officer's use of likely deadly force to end a high-speed car chase, the Court noted that "*Graham* did not establish a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute 'deadly force.' *Garner* was simply an application of the Fourth Amendment's 'reasonableness' test to the use of a particular force in a particular type of situation." *Id.* at 1777 (citing *Graham*, 490 U.S. at 388). The Court went on to state that "[w]hether or not [the police officer's] actions constituted application of 'deadly force,' *all that matters is whether [the officer's] actions were reasonable*." *Id.* at 1778 (emphasis added). *Accord Acosta v. Hill*, 504 F.3d 1323, 1324 (9th Cir. 2007) (holding that, under *Scott*, "there is no special Fourth Amendment standard for unconstitutional deadly force"); *United States v. Gorman*, 314 F.3d 1105, 1111 (9th Cir. 2002) ("[W]e now hold that the 'reason to believe,' or reasonable belief standard . . . embodies the same standard of reasonableness inherent in probable cause.").

4

For this reason, Price's attempt to use *Terry v. Ohio*, 392 U.S. 1 (1968), to establish some daylight between "reasonable belief" and "probable cause" is unavailing. *Terry* permitted police officers to "stop and frisk" individuals where there is "reason to believe" that the individual is "armed and dangerous" even absent "probable cause to arrest the individual for the crime." *Id*. U.S. at 27. But *Terry* was not addressed to the quantity of evidence required for such belief, nor how much confidence the officer must have in it. Rather, the distinction was that a belief that an individual is armed and dangerous could justify a brief detention, whereas arrest requires a belief that the individual has committed a crime. *Id*. at 26-27 ("a perfectly reasonable apprehension of danger may arise long before the officer is possessed of adequate information to justify taking a person into custody for the purpose of prosecuting him for a crime"). The *Terry* Court made clear that the touchstone of the reasonableness inquiry was not the subjective strength of the officer's belief, but its grounding in the objective facts: "[I]n determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific inferences which he is entitled to draw from the facts in light of his experience." *Id*. at 27.

**[4]** That the phrases employed in the PPB's General Order are not distinguishable along the lines Price suggests is also manifest in one of the lead cases upon which Price relies, *Ting v. United States*, 927 F.2d 1504, 1511 (9th Cir. 1991). There, in order to conduct a qualified immunity analysis, we were required to describe the state of the law as a California police officer would have known it in a pre-*Garner* context. We concluded that it "was generally established at the time of the shooting that an officer could use deadly force to effect an arrest if, under the circumstances, he *reasonably believed* such force was necessary to protect himself or others from death or serious bodily harm." *Ting*, 927 F.2d at 1511

(emphasis added). There, we were relying upon a leading California case dealing with the use of lethal force by police officers, *Kortum v. Alkire*, 138 Cal. Rptr. 26 (Ct. App. 1977). Ultimately, considering *Garner* and *Kortum* together, we concluded that "under both the U.S. Constitution and California law, an officer may not use deadly force unless it is necessary to prevent the escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Ting*, 927 F.3d at 1513. We cannot fairly read *Ting* to stand for the proposition that there is a significant legal difference between the terms "reasonably believes" and "has probable cause to believe."

### 5

Price draws our attention to several of our decisions to suggest that there is a difference between the two phrases employed in the PPB's deadly force guidelines in G.O. § 1010.10(a) and § 1010.10(b): "reasonable belief" and "objective probable cause." We examine each in turn.

In *Brewer v. City of Napa*, 210 F.3d 1093 (9th Cir. 2000), which involved the use of police dogs, we had to decide whether jury instructions in an excessive force claim were required to invoke *Garner*'s "probable cause" language. In considering both *Garner* and *Graham*, we stated that "the existence of probable cause, a more specific and demanding standard, was simply not relevant." *Id*. at 1098. The opinion did not specify, however, what was "more specific and demanding" about the *Garner* formulation.

We declined to hold in *Brewer* that a jury instruction should have required that the officer have probable cause *to believe that the plaintiff was armed* in order to justify the use of police dogs. *Id*. at 1097. Rather, we held that the less demanding standard from *Graham*, requiring only that the officer believe there was an "immediate threat to the safety of

the officers or others" was sufficient. *Id*. at 1098. The "more specific and demanding" standard of *Garner* is more specific and demanding in that it requires a specific belief—that a fleeing suspect poses a threat of death or serious physical harm.

*Brewer* was merely following this court's precedent in requiring less of a showing of threat to justify the use of police dogs than to justify the use of deadly force. *See*, *e.g.*, *Vera Cruz v. Escondido*, 139 F.3d 659, 661 (9th Cir. 1997) ("[T]he Supreme Court in *Garner* established a special rule concerning deadly force") (*overruled on other grounds*, *Smith v. City of Hemet*, 394 F.3d 689 (9th Cir. 2005) (en banc)). What is crucial is not the "objectivity" of the officers' beliefs but the *object* of those beliefs. That is, when there is objective reason to fear for one's safety (as in *Brewer*), but not one's life, then force short of deadly force might be justified; to justify deadly force, an objective belief that an imminent threat of death or serious physical harm is required. In neither case would a merely subjective sense of threat justify the use of force; rather, the objectively describable totality of the circumstances would have to be such as to justify the use of force. Sincerely held but unreasonable belief does not justify the use of force under *Garner*, *Graham*, or our own precedents.

[5] Nor do our cases turn on the quantum of evidence, as it were, necessary to justify the use of force by a police officer. All the evidence in the world that a police dog might be necessary to locate a suspect (as in *Brewer*) would not justify the use of lethal force; not because the quantity of evidence would be insufficient, but because the kind of evidence would not justify the decision to use deadly force.[2] It is the specifica-

---

[2]Judge Fisher misconstrues our application of the term "quantum of evidence." We do not suggest that the objective strength of an officer's belief "has no relevance" for Fourth Amendment purposes, and we agree with Judge Fisher that our articulation of the objective reasonableness standard

tion of the threat (as an immediate one involving death or serious physical harm), not the putative difference between "reasonable belief" and "probable cause," that controls. Thus, in *Fikes v. Cleghorn*, 47 F.3d 1011, 1014 n.2 (9th Cir. 1995), when we stated in a footnote that, "[w]hile the use of 'force' is reasonable under the Fourth Amendment if it would seem justified to a reasonable police officer in light of the surrounding circumstances, the use of 'deadly force' is only justified if the officer has probable cause to believe that a suspect poses a threat of serious physical harm to the officer or others," we were specifying the kind of surrounding circumstances that uniquely justify the use of deadly force—a threat of serious physical harm or worse.[3] The use of "probable cause" is, as in *Pringle*, synonymous with "reasonable belief," and the use of deadly force is tied to the nature of the threat, not to the quantum of evidence required to believe in it.[4]

6

Another case invoked by Price actually decisively demonstrates our point. In *Monroe v. City of Phoenix*, 248 F.3d 851

---

"continues to incorporate [a] dangerousness element." We merely note the distinction between the strength of an officer's belief and the requirement that the belief pertain to a requisite type of dangerousness. That is, regardless of the *objectivity* of an officer's belief, the threshold issue is whether the *object* of that belief is sufficient. Where *Graham* and *Garner* differ is in the latter; *Scott* requires the conclusion that the same strength of belief is required in both cases.

[3]In any event, as the district court noted in its decision here, in *Fikes* we declined to reach the deadly force jury instruction issue altogether, as the plaintiff had failed to present any evidence that the officers had used deadly force. 47 F.3d at 1014.

[4]Again, this usage merely reflects the standard meaning for probable cause, which *Black's Law Dictionary* defines in part as "reasonable ground" or "sufficient cause." *Black's Law Dictionary*, 1239 (8th ed. 2004); *see, inter alia, Wheeler v. Nesbitt*, 65 U.S. 544 (1860) (approving definition of "probable cause" as "the existence of such facts and circumstances as would excite . . . belief, in a reasonable mind").

(9th Cir. 2001), we relied on the language from *Brewer* and *Fikes*, *inter alia*, to hold that a *Garner* deadly force instruction was required where the use of deadly force was at issue, rather than a more general instruction on excessive force. Notably, we relied also upon our decision in *Quintanilla v. City of Downey*, 84 F.3d 353, 357 (9th Cir. 1996), which itself considered whether the *Graham* formula had not simply subsumed the *Garner* formula. We found the error in *Monroe* to be harmless because the jury had also been instructed that, under Arizona law, deadly force could only be used when "the police officer believes that deadly physical force is immediately necessary to protect himself against the other's use or imminent use of unlawful deadly physical force." 248 F.3d at 860. Because the jury found for the police officer on that claim, we held that "the jury must have concluded that Sgt. Sherrard had 'probable cause to believe' that Monroe 'posed a threat of serious physical harm' to him or others." *Id.* (quoting *Garner*, 471 U.S. at 11).

7

**[6]** We are satisfied that our case law does not support Price's contention that "reasonable belief" is a lesser standard than "probable cause" as a matter of law. Both standards are objective and turn upon the circumstances confronting the officer rather than on the officer's mere subjective beliefs or intentions, however sincere. Our case law requires that a reasonable officer under the circumstances believe herself or others to face a threat of serious physical harm before using deadly force. Moreover, as the Supreme Court clarified in *Scott*, the touchstone of the inquiry is "reasonableness," which does not admit of an "easy-to-apply legal test." 127 S. Ct. at 1777-78. The City's policy requires that an officer have a reasonable belief in an "immediate threat of death or serious physical injury" and thus comports with the requirement.

**[7]** Accordingly, the district court correctly concluded that the City's policy governing the use of deadly force was not,

as written, contrary to the requirements of the Fourth Amendment.

## B

Price next contends that the City's policy, as interpreted by statements made in depositions by Chief Foxworth and the City's legal arguments before the district court, suffices to sustain a *Monell* claim based on a "longstanding procedure," even if the City's policy as written is constitutional. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 168 (1970); *see also Ulrich*, 308 F.3d at 984-85.

### 1

Price emphasizes the City's concession in legal arguments before the district court that "reasonable belief" was a label for a standard "less specific and demanding" than "probable cause." As the discussion above has shown, the City was tracking the language of *Brewer* and similar cases, which, while admittedly confusing in their references to the *Garner* and *Graham* framework, did not actually distinguish between "reasonable belief" and "probable cause" but between the circumstances justifying the use of deadly force and those justifying the use of lesser force.

[8] Moreover, the City's legal argument before the district court cannot, by itself, establish a "longstanding custom" related to the shooting at issue here. As the City rightly notes, this court is not bound by the concessions of parties concerning the meaning of the law. *United States v. Ogles*, 440 F.3d 1095, 1099 (9th Cir. 2006) (en banc) (court "not bound by a party's concession as to the meaning of the law, even if that party is the government and even in the context of a criminal case").

Price specifically notes that in depositions related to this litigation, Chief Foxworth stated that he believed there was a

difference between "reasonable belief" and "probable cause."
In the first instance, Chief Foxworth agreed with a question
from an attorney that "there's some difference in the amount
of confidence that the officer needs to have before using
deadly force for self-defense . . . that that's a slightly different
standard than the probable cause standard where someone is
escaping?" But in the same colloquy, when pressed as to
whether a reasonable belief left "room for difference of opin-
ion," Chief Foxworth replied, "no, that's why I think they're
pretty close." Chief Foxworth's descriptions of the need to
look at the circumstances, rather than the subjective beliefs of
the officer, are clear from the record.

That Chief Foxworth assumed there was some difference
between the two different phrases applying to two different
scenarios is nevertheless troubling, a point on which we agree
with our colleague in dissent. From the same deposition testi-
mony, Price points to a question which suggests that Chief
Foxworth thought the "reasonable belief" standard to be sub-
jective. The question and answer went as follows:

> Q.   All right. When we talk about subparagraph
> A, when we talk about reasonable belief, I've read a
> lot of the training material that the department has
> put out. And there's discussion about subjective rea-
> sonable belief and objective reasonable belief, and
> I'm wondering what your understanding is of a situa-
> tion. And let's just talk about self-defense rather than
> defense of others.
>
> If a police officer is in a situation where he or she
> personally, reasonably, honestly believes that they're
> in a self-defense situation and they're facing the
> immediate threat of death or immediate serious
> physical injury, is that sufficient to be within sub-
> paragraph A, or does it have to be some objective,
> you know, kind of imaginary objective officer who
> has the reasonable belief?

A.  It's the first one that you've described.

This exchange between the lawyer and Chief Foxworth is more ambiguous than Price suggests, since the question itself includes both subjective and objective elements. The question includes the term "reasonably" in the first scenario, and tracks the language that "they're facing the immediate threat of death or immediate serious physical injury." Thus, it is possible that Chief Foxworth was not embracing a subjective standard at all.

**[9]** To dispose of a case on summary judgment, however, ambiguity in favor of the defendant is not sufficient. If a reasonable person could side with the plaintiff's interpretation of events, the issue must survive for trial. We conclude that there is a genuine issue of material fact as to whether the City's interpretation of the differing phrases in G.O. § 1010.10(a) and § 1010.10(b) represents the sort of "longstanding" custom or practice that can establish Price's *Monell* claim even though the formal written policy does not.

2

Price's arguments about the application of the City's deadly force policy are not limited solely to the interpretation of the policy. She also contends that the City has failed adequately to discipline officers for the inappropriate use of deadly force, and has trained them in such a fashion as to lead to the unjustified use of deadly force. Price's case depends largely upon the Streed Declaration, which in turn relies upon the purported difference between "reasonable belief" and "objective probability" discussed above. It is hard to know how much weight to give an expert report that seems, as the district court noted, to incorporate that assumption throughout its own analysis. In addition to the Streed Declaration, however, other evidence in the record, such as the PARC report, could support Price's claims.

**[10]** The district court was unwilling to give the Streed Declaration sufficient weight to survive summary judgment once it found error in the legal distinction relied upon therein. Further, the district court concluded that the City's unsuccessful attempts at discipline should be credited, and could not serve as evidence that "no officer had been disciplined." While the district court's conclusions concerning this evidence may well be reasonable and even persuasive, those are arguments for trial, and do not comport with the obligation of the court, on summary judgment, to draw all inferences in favor of the nonmoving party. Thus, we are unable to conclude that no rational trier of fact could agree with Price's interpretation of the City's history of discipline and training and its relevance to an allegedly unconstitutional "longstanding" use of deadly force in situations where the objective facts did not support such force.

C

**[11]** Finally, Price contends that the City's alleged failure to train its police officers appropriately as to the use of deadly force amounts to a constitutional violation by itself. The "inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Price argues that her failure-to-train claim meets the standard set by *Harris* and should itself suffice to make out a *Monell* claim against the City.

Under *Harris* and progeny, one must demonstrate a "conscious" or "deliberate" choice on the part of a municipality in order to prevail on a failure to train claim. *See Blankenhorn v. City of Orange*, 485 F.3d 463, 484 (9th Cir. 2007). *Harris*'s standard is objective in that it does permit a fact finder to infer "constructive" notice of the risk where it was "obvious"—but this is another way of saying that there needs to be some evidence that tends to show a conscious choice. *See Farmer v.*

*Brennan*, 511 U.S. 825, 841 (1994) ("It would be hard to describe the *Canton* understanding of deliberate indifference, permitting liability to be premised on obviousness or constructive notice, as anything but objective.").

**[12]** Price points to nothing in the record or in the Streed Declaration that evinces the deliberate indifference that *Harris* requires for a free-standing failure-to-train claim to succeed. The City's description of the many hours of training required for PPB officers is undisputed. Given our conclusion that the City's policy on the use of deadly force is constitutional as written, the undisputed fact that the City trains according to that policy does not advance Price's argument. Considering the high burden laid out in *Harris*, the district court was correct to find that even if the City's training may not have been ideal, Price offers nothing that would establish the kind of "conscious" or "deliberate" choice by the City to risk a "likely" violation of constitutional rights. *See Harris*, 489 U.S. at 389.[5]

**[13]** Accordingly, construing the evidence in the light most favorable to Price, we conclude that no rational finder of fact could decide that the City violated Perez's constitutional rights by a failure to train. The district court properly granted summary judgment to the City on the claim that its training practices amount to a violation under *Harris*.

### III

For the foregoing reasons, we agree with the district court that the City's official policy concerning the use of deadly

---

[5]Judge Fisher also points to Chief Foxworth's statement that "reasonable belief" constitutes a lesser standard than "probable cause" as requiring reversal on the failure to train claim. However, we fail to see how that subjective misconception can give rise to an inference as to an actual deficiency in police training, absent some greater showing of a link between them.

force, as written, does not violate the requirements of the Constitution. Further, we agree with the district court that Price has not made a sufficient showing of a failure to train on the part of the City to survive summary judgment. We conclude, however, that a genuine issue of material fact exists as to whether a "longstanding" practice or custom of the City might in fact have deprived Perez of his constitutional rights.

The decision of the district court is therefore

**AFFIRMED in part, REVERSED in part, and REMANDED.**

FISHER, Circuit Judge, concurring in part, dissenting in part and concurring in the judgment:

No decision is more important or difficult in police officers' performance of their duties than whether to resort to the use of deadly force against a suspect, and none has such catastrophic consequences for the target of such force. The majority brings a degree of clarity to the law of deadly force, but I fear that some of its analysis may confuse the issue, and I therefore cannot adopt all of its reasoning as I shall explain. The practical impact of rank-and-file police officers' understanding of what the Fourth Amendment deadly force standard requires is quite literally a matter of life or death, both for officers and for the public, and we need to give law enforcement the clearest directives possible. I also write separately to dissent from the majority's affirmance of summary judgment for the City of Portland on Price's claim that it failed to train its police officers properly.

I.

The need for clarity in articulating the standard for use of deadly force is illustrated graphically — perhaps tragically, if

Price's theory of what resulted in Officer Sery's fatal shooting of James Perez proves correct — by the Portland Police Bureau's ("PPB") apparent misunderstanding of the deadly force policy at issue here. Amplifying the majority's factual summary of the contextual background makes this need even more obvious.

### A.

On March 28, 2004, Perez was driving in North Portland when he failed to properly signal a right turn into a strip mall. Portland Police Officers Sery and Sean Macomber had been tailing Perez in their patrol car because Perez's car, age and nervousness aroused their suspicions that he might be involved in illegal drug activity. They followed Perez into the parking lot, turned on their car's overhead lights and parked behind him. Twenty-four seconds later Officer Sery, who had approached the car from the driver's side, shot Perez through the open driver's side window, killing him.

What happened during this brief period is subject to dispute. The officers testified that Perez had been resistant when they asked him for identification and that when they tried to physically subdue him he reached into his pocket and began digging for something. Officer Sery claims that he fired his gun only after Perez failed to follow repeated commands to show his hands and after it appeared that Perez had pulled something from his pocket. Several eyewitnesses told a radically different story, in which the officers approached Perez's car with guns drawn and Perez complied with the officers' instructions. One eyewitness further testified that Perez did not put his hands in his pockets at all, and instead put his right hand in the air while attempting to unbuckle his seatbelt with his left hand to comply with the officers' instructions to exit the car. It is undisputed that Perez's seatbelt was still buckled when he was shot and that he was unarmed.

## B.

Because it is central to our disposition of the case, I repeat PPB General Order ("G.O.") § 1010.10's specific language below:

> The Bureau recognizes that members may be required to use deadly force *when their life or the life of another is jeopardized by the actions of others*. Therefore, state statute and Bureau policy provide for the use of deadly force under the following circumstances:
>
> > a. Members may use deadly force to protect themselves or others from what they **reasonably believe** to be an *immediate threat of death or serious physical injury*.
> >
> > b. A member may use deadly force to effect the capture or prevent the escape of a suspect where the member has **probable cause to believe** that the suspect poses a *significant threat of death or serious physical injury to the member or others*.
> >
> > c. If feasible, some warning has been given.
>
> Members must be mindful of the risks inherent in employing deadly force. A member's reckless or negligent use of deadly force is not justified in this policy or State statute. Members are to be aware that this directive is more restrictive than state statutes.

G.O. § 1010.10 (emphasis added) (hereinafter "the PPB Policy").[1]

Police Chief Foxworth indicated that he interpreted this policy to mean that the "reasonable belief" required to shoot an attacking suspect was a "less specific and demanding" standard than the "probable cause" required to shoot a fleeing suspect. He understood *probable cause* to mean a level of confidence of "more likely than not," which others might "describe [ ] as 51 percent versus 49 percent." Although he thought *reasonable belief* was "pretty close . . . if not the same," when asked if "there's some difference in the amount of confidence that the officer needs to have before using deadly force for self-defense . . . that that's a slightly different standard than the probable cause standard where someone is escaping," he responded that "I believe that, yes, there is. *I believe they're close, but I believe there is a difference*." (Emphasis added.).

### 1.  *The objective reasonableness standard*

The crux of this case is what the Fourth Amendment's objective reasonableness standard requires before an officer may resort to deadly force. The majority frames this issue as presenting two questions: First, is there a *legal* distinction under the Fourth Amendment between the "probable cause" and "reasonably believe" formulations? Second, insofar as the City and PPB understood and applied the PPB Policy in practice, was there an *actual* distinction between these formulations, one that encouraged or tolerated police officers' using

---

[1]The district court incorrectly suggested that a lesser standard might apply to the use of deadly force when an officer is confronting an attacking rather than a fleeing suspect. The standard is the same in either circumstance. *See, e.g.*, *Billington v. Smith*, 292 F.3d 1177, 1184 (9th Cir. 2002); *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994); *Ting v. United States*, 927 F.2d 1504, 1510 n.3 (9th Cir. 1991). Of course, that a suspect is fleeing rather than attacking may be relevant to whether or not he poses a risk of harm to anyone.

deadly force when it was objectively unreasonable to do so? I generally agree with the majority's conclusions that the policy as written can be construed to be constitutional, but that in practice it might have been understood to allow constitutionally impermissible uses of deadly force. I am concerned, however, that the majority's opinion could be read to describe incorrectly what is embodied in the Fourth Amendment's objective reasonableness standard.

I agree with the majority that an officer's use of deadly force is justified only if the totality of the circumstances support an "objective[ly reasonable] belief that an imminent threat of death or serious physical harm" exists. Op. at 796. In *Tennessee v. Garner*, 471 U.S. 1 (1985), the Supreme Court formulated the objective reasonableness standard in the deadly force context in terms of probable cause, holding that it "may not be used . . . unless the officer has probable cause to believe that a suspect poses a threat of serious physical harm to the officer or others." *Id.* at 3. Since then, we have often distinguished the deadly force context by using the probable cause formulation instead of the more general reasonableness standard articulated for the non-deadly force context in *Graham v. O'Connor*, 490 U.S. 386 (1989). Typical of this distinction is *Fikes v. Cleghorn*, 47 F.3d 1011 (9th Cir. 1995), which noted that:

> While the use of "force" is reasonable under the Fourth Amendment if it would seem justified to a reasonable police officer in light of the surrounding circumstances, the use of "deadly force" is only justified if the officer has *probable cause* to believe that a suspect poses a threat of serious physical harm to the officer or others.

*Id.* at 1014 n.2 (Leavy, J.) (citing *Garner*) (emphasis added); *see also Brewer v. City of Napa*, 210 F.3d 1093, 1098 (9th Cir. 2000) (O'Scannlain, J.) (stating that "probable cause" is "a more specific and demanding standard" than the more gen-

eral reasonableness standard applied in non-deadly force cases);[2] *Vera Cruz v. City of Escondido*, 139 F.3d 659, 661 (9th Cir. 1996) (noting that "*Garner* established a special rule concerning deadly force"), *overruled on other grounds by Smith v. City of Hemet*, 394 F.3d 689 (9th Cir. 2005) (en banc); *Quintanilla v. City of Downey*, 84 F.3d 353, 357 (9th Cir. 1996) ("*Garner* and *Graham* set forth somewhat different standards for proving a Fourth Amendment excessive force violation. The *Garner* standard . . . can apply only when deadly force has been used.") (internal citations omitted).[3]

The majority's reading of the Supreme Court's most recent pronouncement on the use of deadly force in *Scott v. Harris*, 127 S. Ct. 1769 (2007), however, introduces some uncertainty about this longstanding emphasis on the special nature of the use of deadly force. *See, e.g.*, Op. at 793, 798.[4] The majority summarizes its understanding of *Scott* as follows:

---

[2] I accept that what *Brewer* meant by "a more specific and demanding standard" is "more specific and demanding in that it requires a specific belief — that a . . . suspect poses a threat of death or serious physical harm." Op. at 796.

[3] *See, e.g.*, *Bouggess v. Mattingly*, 482 F.3d 886, 890 (6th Cir. 2007) (holding in a case of deadly force, "the question is . . . whether . . . Mattingly had probable cause to believe that Newby posed a threat of serious physical harm to Mattingly or to others"); *Billingsley v. City of Omaha*, 277 F.3d 990, 993 (8th Cir. 2002) ("In *Garner*, the Supreme Court established, absent probable cause of an immediate threat of death or serious bodily injury, use of deadly force is not objectively reasonable."); *Gutierrez v. City of San Antonio*, 139 F.3d 441, 446 (5th Cir. 1998) ("As a subset of excessive force claims, in *Garner*, the Supreme Court held that police use of "deadly force," violates the Fourth Amendment unless 'the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others [.]' ") (internal citations omitted).

[4] *See also Acosta v. Hill,* No. 05-56575, 2007 WL 3013451, at *1 (9th Cir. Oct. 17, 2007) (holding, after *Scott*, that the district court did not err by refusing to give a separate deadly force instruction when the jury received an excessive force instruction).

The Supreme Court very recently confirmed and clarified this analysis of the relationship between *Garner*, *Graham*, and the Fourth Amendment's reasonableness requirement in *Scott v. Harris,* 127 S. Ct. 1769 (2007). In considering the reasonableness of a police officer's use of likely deadly force to end a high-speed car chase, the Court noted that "*Garner* did not establish a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute 'deadly force.' *Garner* was simply an application of the Fourth Amendment's 'reasonableness' test to the use of a particular force in a particular type of situation." *Id*. at 1777 (citing *Graham*, 490 U.S. at 388). The Court went on to state that "[w]hether or not [the police officer's] actions constituted application of 'deadly force,' *all that matters is whether [the officer's] actions were reasonable*." *Id*. at 1778 (emphasis added).

Op. at 793.

I am troubled by the majority's special emphasis on the phrase: "all that matters is whether [the officer's] actions were reasonable." By emphasizing this one passage, the majority risks being read as incorrectly expanding the Court's holding in *Scott*, and removing from the reasonableness equation in deadly force cases the well-established requirement that the suspect must reasonably be thought to pose a threat of death or serious injury.[5] I understand the majority has no intent to do so, given its later statement that:

---

[5]I believe it would be incorrect, and very dangerous, to reduce the deadly force standard to such a high level of generality by taking the Supreme Court's statement out of context. The full paragraph from which the quote is taken begins with the Court's statement that *Garner* "did not establish a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute 'deadly force.' " *Scott*, 127 S. Ct. at 1777. The Court characterized Scott's "attempt to craft an *easy-to-apply*

We are satisfied that our case law does not support Price's contention that "reasonable belief" is a lesser standard than "probable cause" as a matter of law. Both standards are objective and turn upon the circumstances confronting the officer rather than on the officer's mere subjective beliefs or intentions, however sincere. Our case law requires that a reasonable officer under the circumstances believe herself or others *to face a threat of serious physical harm before using deadly force*. Moreover, as the Supreme Court clarified in *Scott*, the touchstone of the inquiry is "reasonableness," which does not admit of an "easy-to-apply legal test." 127 S. Ct. at 1777-78. The City's policy requires that an officer have *a reasonable belief in an "immediate threat of death or serious physical injury"* and thus comports with the requirement.

Op. at 798 (emphasis added).

There can be no doubt that *Scott* was not abandoning *Garner*'s prescription that a critical component of the reasonableness standard in deadly force situations is whether the officer has "an objective belief that *an imminent threat of death or serious physical harm*" exists. *Garner*, 471 U.S. at 3 (emphasis added). The Court extensively discussed the facts of the car chase and the high risk of danger that the fleeing suspect's high speed, evasive driving posed to others. *See Scott*, 127 S. Ct. at 1775-76. Plainly, the "reasonableness" inquiry the Court envisions continues to encompass the well-established

*legal test*" as "admirable," but concluded that "in the end we must still slosh our way through the *factbound morass of 'reasonableness.' Whether or not Scott's actions constituted application of "deadly force," all that matters is whether Scott's actions were reasonable.*" *Id.* at 1777-78 (emphasis added). In context, the Court was merely dismissing the respondent's argument that *Garner* prescribed certain preconditions that if not met would mean the use of deadly force was "per se unreasonable."

constitutional principle that resort to deadly force is only justified "to prevent 'serious physical harm, either to the officer or others.' " *Id.* at 1777 n.9 (quoting and explaining *Garner*).[6]

It is important that this fundamental prerequisite to the use of deadly force not be watered down or made ambiguous. Police officers need to have clear guidelines about the use of deadly force, as this case illustrates. In the aftermath of a fatal shooting, a court or jury must "slosh through the factbound morass of reasonableness." *Id.* at 1778. However, the officer in the field must have a clear set of guidelines that he or she can be taught to invoke instinctively when confronted with a potentially dangerous situation, when the awful decision of whether to shoot someone dead might have to be made in split seconds that do not allow for much, if any, "sloshing" and where the wrong choice can result in the death of an actually harmless, even innocent suspect. For this reason, I underscore *Scott*'s emphasis in its reasonableness analysis on the nature of the danger that justified deadly force in that case. And I concur in my colleagues' articulation of the objective reasonableness standard with the understanding that it continues to incorporate this dangerousness element.

I am also quite troubled by the majority's curious suggestion that the amount of "confidence" the officer has in his belief that the requisite threat exists, Op. at 794, or the "quantum of evidence" supporting it, Op. at 796-97, has no relevance in the Fourth Amendment analysis of reasonableness. I disagree.

An officer must have a sufficient basis for and confidence in his or her belief that the suspect really does pose a immi-

---

[6]*See Scott*, 127 S. Ct. at 1779 (Ginsburg, J., concurring) ("I do not read today's decision as articulating a mechanical, *per se* rule. The inquiry described by the Court is situation specific. Among relevant considerations: Were the lives and well-being of others (motorists, pedestrians, police officers) at risk?") (internal citations omitted).

nent threat of death or serious physical injury. As the majority acknowledges, it is not enough that the officer idiosyncratically apprehends a threat to be real. Op. at 796. Plainly, if an officer's fears rest on the flimsiest of grounds, then not even the sincerest conviction that only deadly force can avert an otherwise inevitable calamity will justify its use. The officer must have a *reasonable* belief, not just *a* belief, in the existence of that threat. Thus, we must be clear that the objective reasonableness analysis takes into account *both* the *nature* of the perceived threat and the *soundness* of the officer's basis for making that assessment.

My concurrence is therefore directly conditioned on the understanding that reasonable belief in the deadly force context does not water down the degree of reliability and confidence that has been inherent in the traditional probable cause formulation. *See United States v. Gorman*, 314 F.3d 1105, 1111 (9th Cir. 2002) ("We now hold that the . . . reasonable belief[ ] standard . . . embodies the same standard of reasonableness inherent in probable cause."). Only if the officer's beliefs are objectively reasonable can he or she be justified in taking a life.

We should not underestimate the significance of improperly discounting the reliability component of objective reasonable belief. Fourth Amendment jurisprudence establishes that we must scrutinize the probative quality of the evidence supporting an officer's belief. As early as the nineteenth century, Chief Justice Marshall explained that "the term 'probable cause,' according to its usual acceptation, *means less than evidence* which would justify condemnation." *Locke v. United States,* 11 U.S. (7 Cranch) 339, 348 (1813) (emphasis added). Quoting Chief Justice Marshall with approval, *Illinois v. Gates*, 462 U.S. 213 (1983), elaborated by noting "probable cause does not demand *the certainty* we associate with formal trials. It is enough that there was *a fair probability*." *Id.* at 235, 246 (emphasis added).[7] The Court's description of the

---

[7]*See also id.* at 232 ("Probable cause is a fluid concept — turning on the assessment of probabilities in particular factual contexts . . . ."); *United*

totality-of-the-circumstances analysis, the very approach the majority endorses, Op. at 796, has similarly considered the "quantum of evidence" supporting the officer's beliefs:

> [P]robable cause[ ] is dependent upon both the content of information possessed by police and its degree of reliability. Both factors — quantity and quality — are considered in the 'totality of the circumstances, the whole picture' that must be taken into account . . . . Thus, if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable.

*Alabama v. White*, 496 U.S. 325, 330 (1990).

Contrary to the majority's suggestion, *Maryland v. Pringle*, 540 U.S. 366 (2003), which stated that "[t]he probable-cause standard is incapable of precise definition or quantification into percentages *because it deals with probabilities*," is entirely consistent with my view. *Id.* at 371 (emphasis added). We do not require officers to be absolutely sure that a threat of death or serious physical injury is real before using deadly force. But we do require that officers have an objectively reasonable basis for believing that the threat is real. And in making that assessment, we look to factors like the "quantity," "quality," "content" and "reliability" of the information supporting the officer's belief. *See White*, 496 U.S. at 330.

*Scott* itself recognized that the soundness of an officer's belief that a threat exists is a part of the Fourth Amendment

States v. Sokolow, 490 U.S. 1, 7 (1989) ("We have held that probable cause means 'a fair probability . . . .'"); *Brinegar v. United States*, 338 U.S. 160, 175 (1949) ("In dealing with probable cause . . . as the very name implies, we deal with probabilities.").

reasonableness analysis. In affirming the officer's use of force in a high speed car chase in that case, the Court relied on both the nature of the threat *and* how apparent that threat must have appeared to the officer at the time of the incident. *See Scott*, 127 S. Ct. at 1778. That the latter was an important ground for the Court's holding is shown by Justice Scalia's extensive discussion of the videotape of the chase, which "quite clearly contradict[ed] the version of the story told by respondent" by graphically revealing the dangerously high threat posed by the fleeing suspect. *Id.* at 1775. As Justice Scalia emphasized, it was "clear from the videotape" that the officer had an objectively sufficient basis to believe that the suspect posed a real danger. *See id.* at 1778. Unlike most cases, the Court was able to see from the officer's perspective the actual conditions that led the officer to believe deadly force was necessary. Given that perspective, the only issue remaining was how to " 'balance the nature and quality of the intrusion . . . against the importance of the governmental interests alleged to justify the intrusion.' " *Id.* (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)).

*Scott* thus left unaltered the bedrock principle that the objective reasonableness standard requires us to examine not only *what* an officer believes, but *why* he believes it. When the "nature and quality" of the intrusion are "minimal[ ], . . . opposing law enforcement interests" can support the intrusion "based on less than probable cause." *See Place*, 462 U.S. at 703. Conversely, when the "nature and quality" of the intrusion are great, as when deadly force is used, the Fourth Amendment objective reasonableness standard requires that the officer's beliefs about the threat have a firmer, more precise basis.

*Scott*'s characterization of *Garner* further reinforces the continuing importance of assessing the "quantum of evidence" supporting an officer's belief that a perceived threat exists. *Garner*, the Court wrote, "was simply an application of the Fourth Amendment's 'reasonableness' test to the use of

a particular type of force in a particular situation." *Id.* at 1777. In that case, it was unreasonable for the officer to shoot Garner " 'in the back of the head' " — to use deadly force — because Garner posed no threat. *Id.* (quoting *Garner*, 471 U.S. at 4). The Court agreed that the officer " 'could not *reasonably have believed*' " otherwise in view of the scant support for any contrary belief: Garner was " 'young, slight, and unarmed' " and "running away on foot." *Id.* (quoting *Garner*, 471 U.S. at 21) (emphasis added).

To sum up, the reasonable belief formulation of the Fourth Amendment objective reasonableness standard in the context of deadly force is no less stringent than the probable cause formulation. *See Gorman*, 314 F.3d at 1115.[8] Both formulations justify an officer's use of such force only when it is appropriate in light of the nature of the threat posed *and* when the officer's belief in the existence of that threat is objectively supported by sufficiently reliable evidence. An officer may use deadly force only when the circumstances support an objectively reasonable belief that the suspect poses an imminent threat of death or serious physical harm.

## II.

I also concur in the majority's reversal of summary judgment on Price's "longstanding practice" and failure to discipline claims. I must dissent, however, from its conclusion that Price failed to present sufficient evidence to create a genuine

---

[8]Nothing in our holding today, however, should be read to equate probable cause or reasonable belief with reasonable *suspicion*. *Cf.* Op. at 794 (discussing *Terry v. Ohio*, 392 U.S. 1 (1968)). As *White* explained, "[r]easonable suspicion is a less demanding standard than probable cause." 496 U.S. at 330; *see also Hudson v. Michigan*, 126 S. Ct. 2159, 2182 (2006) (quoting *White* for the proceeding proposition); *Gorman*, 314 F.3d at 1115-16 (finding error when the district court "equated the 'reason to believe' standard . . . with 'reasonable suspicion' instead of probable cause"); *Sokoloaw*, 490 U.S. at 7 (explaining that *Terry*'s reasonable suspicion "is obviously less demanding than that for probable cause").

dispute of material fact regarding her failure to train theory. In so holding, the majority either imposes a novel requirement for establishing liability under a failure to train theory that *City of Canton v. Harris*, 489 U.S. 378 (1989), does not contain or inappropriately elevates the standard for summary judgment review.

A municipality's failure to train its police officers may serve as a basis for § 1983 liability "where the failure to train amounts to deliberate indifference." *Gibson v. County of Washoe*, 290 F.3d 1175, 1194 (9th Cir. 2002) (quoting *City of Canton*, 489 U.S. at 388). In order to prove deliberate indifference, the plaintiff need not show that the municipality intended to violate the rights of the parties concerned. *See id.* at 1195. Rather, where "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent" to this need, then "the failure to provide proper training may fairly be said to represent a policy for which the city is responsible." *City of Canton*, 489 U.S. at 390. Price alleges that the City's deadly force training was so deficient that it amounted to deliberate indifference. *See id.* at 390 & n.10.

The majority concedes that the deliberate indifference standard is "objective" and that it permits "a fact finder to infer 'constructive' notice of the risk where it was 'obvious.' " Op. at 802; *see, e.g.*, *Long v. County of Los Angeles*, 442 F.3d 1178, 1190 (9th Cir. 2006); *cf. Anderson v. Liberty Lobby*, 477 U.S. 242, 245 (1986) (leaving weighing of the evidence to the jury). I believe the declaration provided by Price's expert, Dr. Thomas Streed, is sufficient to require a jury determination here.

Dr. Streed opined that the City's training program for the use of deadly force made it inevitable that police officers would shoot unarmed persons. He specifically cited the City's use of a so-called "slumper" scenario in its training regimen,

in which officers encounter a sleeping suspect in a car who, upon being awakened, immediately pulls out a hidden gun and fires at the officer. He also noted that the officers are trained on a computer simulation system in which suspects invariably attempt to kill the officer being trained. Dr. Streed ultimately concluded that the City's training program "create-[ed] a mindset for Portland officers that every citizen encountered may have a gun, and there is nothing the police officer can do to avoid being killed by a 'bad guy' unless the officer shoots first."

A reasonable jury could conclude on the basis of this evidence, viewed in the light most favorable to Price, that the City "disregarded a known or obvious consequence" of its training practices. *See Gibson*, 290 F.3d at 1194. The Streed Declaration reasonably supports the inference that, quite apart from the letter of the City's deadly force policy, officers were being instilled with a "shoot first" mindset that foreseeably would result in unjustified applications of deadly force. *Cf. City of Canton*, 489 U.S. at 390 n.10.

In addition, a logical inference from Chief Foxworth's admission — as the City's highest ranking police officer and head of the Portland Police Bureau — that he erroneously thought that reasonable belief embodied a lesser standard than probable cause within the context of the City's deadly force policy is that the training of the police force also reflected this mistaken understanding. A reasonable jury could conclude training based on this misconception constituted a failure to train. Therefore, I would permit Price also to pursue that theory of liability on remand.